**No. 23-11027**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

JOSE J. AYALA, JR.  and JEFF SANTOS, on behalf of themselves and as representatives of other class members similarly situated,

*Plaintiff-Appellants*

v.

NISSAN NORTH AMERICA, INC. D/B/A NISSAN USA, a California corporation, and wholly owned subsidiary of Nissan Motor Company of Japan,

*Defendant-Appellees*

Appeal from the United States District Court for the Middle District of Florida

No. 6:20-cv-01625-RBD-GJK

---

**APPELLANTS' APPENDIX: VOLUME II**

---

Kevin K. Ross-Andino, Esq.
Jolynn M. Falto, Esq.

éclat Law, P.A.
307 Cranes Roost Blvd.,
Suite # 2010
Altamonte Springs, Florida 32701
Telephone: (407) 636-7004

*Attorneys for Appellants*

# Index of Appendix

**Docket Entry**

## VOLUME I

District Court Docket Sheet............................................................A

Complaint..................................................................DE 1

Amended Complaint..............................................................DE 40

## VOLUME II

Assurance Products Resource Manual (APRM) (Excerpt #1)...............DE 40-1

Assurance Products Resource Manual (APRM) (Excerpt #2)...............DE 47-1

Answer and Affirmative Defenses to Amended Complaint.....................DE 63

Nissan's Extended Protection Plans.......................................DE 66-3

Declaration of Jose Ayala, Jr............................................DE 67-1

Declaration of Jeff Santos...............................................DE 67-2

## VOLUME III

Renewed Motion to Certify an FLSA Collective Action........................DE 153

Assurance Products Resource Manual (APRM)......................................153-4

Nissan's Dealer Sales and Service Agreement (Dealer Agreement).....DE 153-6

Nissan's Invest in the Best Program...................................DE 153-13

Nissan's Email Regarding Nissan's Technician Orientation Program.......................................................DE 153-14

Nissan's Warranty Boot Camp...........................................................DE 153-15

Nissan's Battery Ad...........................................................................DE 153-16

Renewed Rule 23 Motion to Certify Class..............................................DE 154

Nissan's Renewed Motion for Summary Judgment.................................DE 161

Response in Opposition to Renewed Motion to Certify an FLSA Collective Action....................................................................................................DE 165

## VOLUME IIIV

Response in Opposition to Renewed Rule 23 Motion to Certify a Class...DE 166

Response in Opposition to Nissan's Renewed Motion for Summary Judgment.............................................................................................DE 169

Nissan's Factory-trained Technicians Ad............................................DE 169-1

Nissan's Technician Service Ad..........................................................DE 169-2

Reply to Response in Opposition to Nissan's Renewed Motion for Summary Judgment.............................................................................................DE 172

Order Denying Renewed Motion to Certify an FLSA Class, Denying Renewed Rule 23 Motion to Certify a Class, Granting Nissan's Motion for Summary Judgment, Denying as Moot Daubert Motion, Denying as Moot Motion in Limine..................................................................................................DE 194

Judgment in Favor of Nissan................................................................DE 195

Certificate of Service.................................................................................B

# DE 40-1

# EXHIBIT 1

warranty ◊ f&i products ◊ pre-owned ◊ system ◊ new vehicle

# Assurance Products Resource Manual
**APRM2020–JANUARY**

NISSAN NORTH AMERICA, INC.

## POLICY REVISIONS

For complete details of all policies and procedures, please read all sections carefully.

NOTE:  The APRM is subject to change without notice, and may be amended from time to time. Amendments are effective immediately, unless otherwise specified. Always consult the electronic version of this Manual for the most current and updated information.

| Section Name | Section # | Revision Date |
|---|---|---|
| GENERAL INFORMATION | 1, 2 | 1/20 |
| WARRANTY | 2, 3, 4, 5, 7 | 1/20 |
| F & I | ALL | 1/20 |
| CPO | ALL | 1/20 |
| NEW VEHICLE | 1, 2, 3, 4, 5 | 1/20 |

**POLICY REVISIONS**



**The policies and procedures documented in this manual are those of Nissan North America, Inc and apply to all dealers equally unless state mandated laws state otherwise.**

# TABLE OF CONTENTS

**General Information – Resources** . . . . . . . . . . . . . . . . . . . . . . . . . . **G-1**

**General Information – Terms/Definitions.** . . . . . . . . . . . . . . . . . . **G-8**

**Warranty – Policies and Procedures Manual.** . . . . . . . . . . . . . . . . **W-1**

**Warranty – Policies** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **W-2**

**Warranty – Special Policies and Procedures** . . . . . . . . . . . . . . . . **W-87**

**Warranty – Special Service Claims** . . . . . . . . . . . . . . . . . . . . . . . **W-92**

**Warranty – Reports and Management Tools.** . . . . . . . . . . . . . . . . **W-97**

**Warranty – Legal Related Issues** . . . . . . . . . . . . . . . . . . . . . . . . **W-131**

**Warranty – Forms/Exhibits.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **W-135**

**F & I – Products Operations Manual** . . . . . . . . . . . . . . . . . . . . . . . **FI-1**

**F & I – Reports and Management Tools** . . . . . . . . . . . . . . . . . . . . . **FI-2**

**F & I – Enrollment/Product Description** . . . . . . . . . . . . . . . . . . . . . **FI-4**

**F & I – Security+Plus Vehicle Service Contracts (VSC)** . . . . . . . . . **FI-6**

**F & I – Security+Plus Prepaid Maintenance Agreements (PMA).** . **FI-11**

**F & I – Corporate Vehicle Maintenance (CVM)** . . . . . . . . . . . . . . **FI-13**

**F & I – QualityGuard+Plus Vehicle Service Contracts (VSC)** . . . . . . . . **FI-14**

**F & I – QualityGuard+Plus Prepaid Maintenance Agreements (PMA)** . **FI-17**

**F & I – Ancillary Products** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **FI-18**

**F & I – Forms/Exhibits** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **FI-31**

**Certified Pre-Owned Limited Warranties – CPOLW/CPO Wrap** . . . **CPO-1**

**Certified Pre-Owned Limited Warranties – Forms/Exhibits** . . . . . **CPO-8**

**System Section 1 – Claims** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **S-1**

**System Section 2 – Claims** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **S-21**

**System Section 2 – Troubleshooting Claims** . . . . . . . . . . . . . . . . **S-28**

**New Vehicle – Carrier and Dealer Delivery Procedures** . . . . . . . . **NV-1**

**New Vehicle – Carrier Forms/Exhibits** . . . . . . . . . . . . . . . . . . . . **NV-11**

**New Vehicle – Claims** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **NV-15**

**New Vehicle – Storage** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **NV-20**

**New Vehicle – Pre-Delivery Inspection (PDI).** . . . . . . . . . . . . . . . **NV-25**

**New Vehicle – Dealer Forms/Exhibits.** . . . . . . . . . . . . . . . . . . . . **NV-29**

**GENERAL INFORMATION**
**TABLE OF CONTENTS**

## General Information Section 1
### Resources

1.1:    Phone Numbers ................................................................. G-1
1.2:    Warranty Resource Materials ............................................. G-1
1.2.1:  Flat Rate Manuals .......................................................... G-1
1.2.2:  Service Manuals ............................................................. G-2
1.2.3:  Bulletins ....................................................................... G-2
1.2.4:  Claims Bulletins ............................................................. G-2
1.2.5:  Technical Service Bulletins ............................................. G-2
1.2.6:  Parts and Service Bulletins ............................................. G-2
1.2.7:  Campaign Bulletins ......................................................... G-3
1.2.8:  Service Contract Bulletins .............................................. G-3
1.3:    Warranty Claims Call Center and Powertrain Call Center ...... G-3
1.3.1:  Preparing for Assistance ................................................. G-3
1.4:    Service Contract Pre-Approvals Call Center ...................... G-4
1.5:    Warranty Statements ...................................................... G-4
1.6:    Warranties offered by Nissan   ......................................... G-5
1.6.1:  Replacement Parts Warranty ........................................... G-5
1.6.2:  Over-the-Counter Parts Warranty .................................... G-5
1.7:    Transferring Warranty Coverage ...................................... G-5
1.8:    Voiding/Canceling Coverage ........................................... G-6
1.9:    Directory ...................................................................... G-6

## General Information Section 2
### Terms/Definitions

2.1:    Terms and Definitions ..................................................... G-8

**GENERAL INFORMATION SECTION 1**
**RESOURCES**

## 1.1: Phone Numbers

The following phone numbers are provided to help you contact the individual most likely capable of answering your questions:

| | |
|---|---|
| Warranty Claims Call Center | 800-258-7008 |
| Powertrain Call Center | 800-973-9992 |
| Service Contract Pre-Approval | 855-456-9544 |
| Vehicle Service Contracts | 800-362-4111 |
| Consumer Affairs | 800-647-7261 |
| QualityGuard+Plus | 800-888-5245 |
| Nissan Help Desk | 800-662-3282 |
| | • For NNAnet.com questions, select option 8 |
| | • For Virtual Academy questions, select option 6 |
| | • For dealer claims system or HOST application questions, select option 1 |
| Tech-Line | 800-662-3497 |
| Parts-Eye | 877-880-0816, select option 2 |
| DCS Helpdesk for Dealer Business System (DBS) | 855-699-0747 |

## 1.2: Warranty Resource Materials

Several claim management aids and information resources are available to Nissan dealers. These aids/resources provide additional information regarding policy and procedures, service procedures, and labor times.

Additionally, Nissan provides telephone assistance for questions regarding claims, service agreements, and technical/system support.

### 1.2.1: Flat Rate Manuals

Nissan publishes the Nissan Warranty Flat Rate Manual for use in service operations and claims processing. The Nissan Warranty Flat Rate Manual is available on NNAnet.com, in electronic format only.

The flat rate manual establishes the labor hours required to perform common service operations based on their respective focus. These flat rate times are tied directly to labor Operation Codes (listed in the manual) which are used on Work Orders and claims to document repairs/service.

In addition, the flat rate manual lists the corresponding Symptom and Diagnosis codes that are also necessary for completing Work Orders and claims.

GENERAL INFORMATION SECTION 1
RESOURCES

A dealer may make recommendations regarding established flat rate times, labor overlap, or suggestions for operations not currently covered.  Comment forms are located in the Warranty Flat Rate Manual under the  path: Resources tab>General Information>Flat Rate Review.

## 1.2.2: Service Manuals

Detailed service manuals are available on Automotive Service Information Support (ASIST) for each type of Nissan vehicle and updated as necessary. These manuals describe recommended Nissan repair or diagnostic procedures in detail.

Repair procedures described in the service manuals are used to establish flat rate times.

## 1.2.3: Bulletins

Nissan publishes electronic documents, called bulletins, to provide the dealer with the latest information. The information provided in these bulletins can be procedural,  a corrective action, support, announcements, etc. The following are types of bulletins Nissan publishes:

- Claims Bulletins
- Technical Service Bulletins
- Parts & Service Bulletins
- Campaign Bulletins
- Service Contract Bulletins

## 1.2.4: Claims Bulletins

As information in the Assurance Products Resource Manual requires updating or modification, Nissan releases Claims Bulletins to provide the latest information and procedural guidelines. NNAnet.com contains recently published claims bulletins.

These bulletins may be issued at any time and are important because they add to the body of information in this manual.

## 1.2.5: Technical Service Bulletins

These bulletins focus on service and repair procedures. Unlike Claims Bulletins, Technical Service Bulletins are available only on ASIST (Automotive Service Information Support) and NNAnet.com.

ASIST is an electronic technical information delivery system designed and developed by Nissan.

Note:  Nissan also publishes Parts Bulletins on a frequent basis, however, these bulletins are typically routed directly to the Parts Department within the dealer.  Information published in Parts Bulletins, that is pertinent to claims processing, is extracted and published as necessary in a Claims Bulletin.

## 1.2.6: Parts and Service Bulletins

Nissan publishes Parts and Service bulletins periodically announcing new programs and policies as it relates to service.

**GENERAL INFORMATION SECTION 1**
**RESOURCES**

## 1.2.7: Campaign Bulletins

Nissan publishes electronic Campaign Bulletins periodically to identify corrective action pertaining to Nissan vehicles.  This includes items ranging from minor quality corrections (e.g., door trim) or customer satisfaction issues to major safety recall campaigns.

These bulletins are comprehensive in nature and include specific inspection and/or corrective action procedures, VIN applicability information, claims processing information and procedures, and other documentation as required. Campaign Bulletins are available on ASIST and on NNAnet.com.

Prior to submitting a claim for performance of a campaign, the dealer must ensure that the claim adheres to the guidelines and information contained in the Campaign Bulletin.

> Note: There are serious legal implications for Nissan and Nissan dealers associated with campaigns. Close adherence by dealers to guidelines published in Campaign Bulletins is mandatory.

## 1.2.8: Service Contract Bulletins

Nissan publishes electronic-based Service Contract Bulletins periodically to update information specific to the management and administration of service contracts.  This includes procedural guidelines, program announcements and coverages, and Dealer Rate Guides, et al.

## 1.3: Warranty Claims Call Center and Powertrain Call Center

In an effort to assist dealers with suspended claims issues and pre-authorization of repairs over DCAL, the Warranty Department maintains two call centers. The Warranty Claims Call Center and the Powertrain Call Center are designed to assist dealers in improving their claims administration performance.

Warranty Claims Call Center Representatives evaluate repair requests for pre-approval and suspended claims. The WCCC also provides claims coding support information, recommending what action should be taken to accurately process claims. Representatives staff the call center M-F, 7:00 a.m. - 7:00 p.m. Central Time.

Powertrain Call Center Representatives provide pre-approvals for all CVT replacement requests, all engine replacement requests, and administer LEAF Lithium Ion Battery (lib) warranty and customer pay replacements. PCC also provides technical support for special claims programs. Representatives staff the call center M-F, 7:00 a.m. - 7:00 p.m and on Saturday from 8:00 a.m - 2:00 p.m. Central Time.

Keep in mind that Representatives staffing both call centers do not create policies or procedures. They simply adhere to the policies and procedures that management and legal have created and approved.

## 1.3.1: Preparing for Assistance

To ensure the most expeditious and efficient handling of your claims question, it is important that you be prepared when you call. Before calling the Warranty Claims Call Center or the Powertrain Call Center, consider the following:

- Only call when you need help determining how to get a suspended claim (e.g., warranty, Security+Plus, campaign) approved.
- First look for your answer based on the code(s) on the Suspended Claim Report and information in the pertinent manuals, such as the APRM, the Nissan Warranty Flat Rate Manual (WFRM), etc.

**GENERAL INFORMATION SECTION 1**
**RESOURCES**

- If your problem relates to the Dealer Communication System (DCS), contact support at 855-699-0715.

- The call center phone lines are busiest in the morning and at month end. The Warranty Claims Call Center is staffed M-F from 7:00 a.m. - 7:00 p.m and the Powertrain Call Center is staffed M-F from 7:00 a.m. - 7:00 p.m and Saturdays from 8:00a.m. - 2:00 p.m. Central Time.

- Have your system up and running before calling.

- Have the following information and reference materials available when you call:
  - APRM, WFRM, related bulletins
  - Claim documentation (Work Order, tech notes, sublet bills)
  - Dealer Code
  - Claim disposition report (if applicable)
  - Completed Claims Pre-Approval Checklist
  - Pre-Call Form (Found in ASIST)
  - Categorize your claim questions according to "suspension code/message". This enables the Call Center representative to focus on a single claim from each category, rather than spend time going through different claims within each category.

## 1.4: Service Contract Pre-Approvals Call Center

A claims specialized support organization operated by NESNA providing Service Contract and Certified Pre-Owned (CPO) claim pre-approval under the following conditions:

1. A claim that exceeds a Dealer's Service Contract DCAL of $150.
2. A claim over Service Contract DCAL.
3. All CVT Transmission replacements or Engine assembly replacements; regardless of Service Contract DCAL limit.

Representatives also provide Service Contract claims coding support information recommending what action should be taken to accurately process claims. The claims call center is staffed M-F 8:00 a.m.- 6:00 p.m. and on Saturday from 10:00 a.m. to 2:00 p.m. Central Time. Telephone: 855-456-9544

Note: Security+Plus Prepaid Maintenance claims do not require pre-approval.

## 1.5: Warranty Statements

Warranty Statements can vary by model and model year. The Warranty Information Booklet provided with the new vehicle is the source of the applicable warranty statements. Warranty Information Booklets can be found at nissanusa.com>For Owners>Manuals & Guides. In addition, Service Comm and National Service History (NSH) are other sources for warranty coverage.

Note: Other warranties not offered by Nissan include Tires and Bedliners. These warranties are covered by the Tire and Bedliner Manufacturer. Please see the Warranty Information Booklet for more detail.

**GENERAL INFORMATION SECTION 1**
**RESOURCES**

## 1.6: Warranties offered by Nissan

All new Nissan vehicles automatically come with a suite of limited warranties providing comprehensive coverage backed by Nissan North America. These warranties include:

- Emissions Control Warranties - This includes emission defects and emission performance warranties for both Federal and California emission-equipped vehicles.

- New Vehicle Limited Warranties - This includes the Basic and Powertrain warranties.

- Seat Belt Warranty - This warranty is limited to the actual seat belt system in the vehicle. Airbags and related electronic components are covered under the New Vehicle Limited Warranty.

- Replacement Parts - Nissan also warrants replacement parts supplied by Nissan for use on Nissan vehicles.  In general, the duration of a warranty for a replaced part may extend beyond any applicable existing vehicle warranty, but will not expire prior to the end of the applicable vehicle warranty. If the part or accessory to be repaired was originally installed by an authorized Nissan dealer, it will be removed and reinstalled after repair at no charge for parts and labor. If the  part or accessory was not installed by an authorized Nissan dealer, the part or accessory will be repaired or exchanged only.

### 1.6.1: Replacement Parts Warranty

- Replacement Parts and Accessories Limited Warranty - This warranty covers replaced parts for 12 months/12,000 miles, whichever occurs first (unlimited mileage for audio components) regardless of whether the parts are installed by the dealer.

- Replacement Battery Warranties - The warranty for prorated coverage for replacement batteries is determined by the replacement battery's manufacturer, i.e., Johnson Controls, Inc. (JCI) or Interstate Battery Systems of America (IBSA).

- Lifetime Replacement Panel Corrosion Limited Warranty - This warranty provides lifetime coverage for perforation (rust through) of a Nissan body panel due to corrosion.

### 1.6.2: Over-the-Counter Parts Warranty

Parts purchased "over-the-counter" and NOT installed by a Nissan dealer are also covered by the Limited Replacement Parts Warranty.

However, only the cost of the part is covered, not the cost of the labor. Work Orders for over-the-counter parts are completed as Primary Part (PP) Work Orders. The current Work Order must list the VIN, as well as the numbers of both the original and second sales receipts. Copies of both must be attached to the current Work Order and filed in the Vehicle Service History File.

Warranties pertaining to replacement parts are provided by Nissan (except for Replacement Batteries), are included with the purchase of the part(s), and are not separately priced or purchased by either the dealer or the vehicle owner.

## 1.7: Transferring Warranty Coverage

Coverage under any of Nissan warranties (excluding CPO) can be transferred to a vehicle's subsequent owners.

> Note: Nissan reserves the right to void warranties, in whole or in part, under certain circumstances.

**GENERAL INFORMATION SECTION 1**
**RESOURCES**

The suite of New Vehicle Limited Warranties apply to vehicles originally sold by an authorized Nissan dealer, registered in the United States, and normally operated in the United States, or Canada.  All warranties provided to the original vehicle owner automatically transfer to any subsequent owners of the vehicle during the warranty period.

There are essentially two ways in which vehicle ownership records can be updated to reflect a change in ownership:

- The Warranty Information Booklet supplied with each new vehicle contains a postage-paid card for changing ownership information. The new owner of the vehicle should complete this form and send to Nissan to update the master records.

- Owner can contact Consumer Affairs at 800-647-7261 and have the Master File updated.

  Note: Details on transferring a CPO warranty are found in the CPO section.

## 1.8: Voiding/Canceling Coverage

A vehicle's warranty may be voided by the warranty's own terms by either #1 or #2 below.  In addition, a specific repair may be expressly excluded from reimbursement by the terms of the warranty, e.g., #3 or #4.  See the Warranty Information Booklet for a much more detailed listing of express exclusions and limitations.

A warranty issued by Nissan is never cancelled but may occasionally be rendered void by operation of the warranty itself. In addition, improper use or maintenance may exclude claims from coverage under the warranty. The warranty statements detail specific owner responsibilities for the care and maintenance of the vehicle.

In specific, identified and disclosed situations, Nissan may selectively void a portion of the new vehicle warranty and sell a particular vehicle as a used unit with no or partial warranty (e.g., no paint coverage). Conditions under which Nissan's warranties and/or Nissan's Certified Pre-Owned Limited Warranties may be voided, in whole or in part or repairs excluded from coverage, include but may not be limited to the following:

1. Tampering the vehicle's odometer or other conditions in which Nissan is unable to determine the accurate vehicle mileage.

2. Issuance of salvage or similar vehicle title, or other condition in which the vehicle has been declared a total loss (or equivalent) by an insurance company.

3. Failure of the vehicle owner to maintain the vehicle according to the manufacturer's recommendations detailed in the Owner's Manual.

4. Modification of the vehicle from the original factory specifications.

## 1.9: Directory

For further information on our products, dealers may call the Vehicle Service Contract Dealer Hotline at (800) 362-4111:

|  | **Menu Option** |
|---|---|
| Assistance with application processing, transfers or cancellations (including QualityGuard+Plus) | 1 |
| Guaranteed Auto Protection (GAP) and Ancillary Policies | 2 |
| Nissan Dealer Claims | 3 |

## GENERAL INFORMATION SECTION 1
### RESOURCES

|  | Menu Option |
|---|---|
| Infiniti Retailer Claims | 4 |
| QualityGuard+Plus Claims | 5 |
| Service Payment Plan Program (SPP) | 6 |
| Certified Pre-Owned (CPO) Carfax | 7 |

**Alternate Dealer Direct Toll-Free Numbers**

| | |
|---|---|
| Nissan Consumer Affairs | 1-800-647-7261 |
| Nissan Roadside Assistance | 1-800-225-2476 |
| Materials Order Status Check | 1-800-247-5321 |
| Security+Plus Claims | 1-800-258-7008 |
| Service Contract Pre-Approval | 1-855-456-9544 |
| QualityGuard+Plus VSC & PMA Claims | 1-800-888-5245 |
| QualityGuard+Plus Roadside Assistance | 1-800-225-2476 |
| 0% Consumer Finance Plan (SPP) | 1-800-346-5990 |
| Security+Plus Branded Ancillary Plan Assistance | 1-800-338-2680 |
| CARFAX | 1-800-274-2277 |
| Lease Wear & Tear Claims Administrator | 1-866-910-5547 |
| | • select option 3 |
| | • then select option 1 |

**Customers may call (800) 647-7261 for information regarding their service or maintenance agreement.**

**TO ORDER FORMS AND BROCHURES**

1. Go to www.nnanet.com
2. Go to "My Links" tab
3. Under "Dealer Operations," choose "Dealer Materials Ordering" link
   The link will redirect to www.nissanordering.nnanet.com
4. Choose Forms/Service Manuals/Brochures...

GENERAL INFORMATION SECTION 2
TERMS/DEFINITIONS

## 2.1: Terms and Definitions

### A

| | |
|---|---|
| **Add–On (Work Order)** | A repair action added to the Work Order after initial write–up and approval by the customer. Pre-approval by the Service Manager or higher and the customer must be obtained for all add-on repairs; Shop foremen and technicians are not autho-rized to add repairs to the Work Order. All add-on repairs must start with the words 'add-on' on the work order and in the Technician and service advisor comment fields. |
| **Adjusted Price** | The price of a part after dealer markup. For non-Nissan parts and parts where pro-rata applies (e.g., batteries), this price is equal to Dealer Net. |
| **Aftermarket** | Non-OEM products not designed, sold, or approved by Nissan North America, Inc., and generally intended to be installed on a vehicle after it has been purchased from Nissan. |
| **Application** | A request for service agreement coverage. |
| **Assurance Product** | A type of contract between Nissan and its customers dealing with the service and repair of the vehicle. Assurance Products include warranties, campaigns, and service agreements. Warranties apply to new or used vehicles and parts; service agreements may apply to either new Nissan vehicles (Security+Plus), pre-owned Nissan vehicles (Security+Plus), or used non-Nissan vehicles (QualityGuard+Plus). Maintenance+Plus agreements may apply to new or used Nissan vehicles. |
| **Audit** | An inspection by Nissan of the dealer's records to determine compliance with Nissan policies and procedures and the Dealer Sales and Service Agreement. Non-compliance may result in a chargeback of funds paid to the dealer or other remedies to be applied according to Nissan Corporate policy. |
| **Authorization** | Approval from Nissan either by the Warranty Claims Call Center, the Powertrain Call Center, Service Contract Call Center, or Regional Representative. |

GENERAL INFORMATION SECTION 2
TERMS/DEFINITIONS

## B

**Bill of Lading**   A document which details the materials being transported and is used by some transport companies to note transportation damage at each point the vehicle changes hands, including when it is checked in at the dealership.

## C

**Campaign**   The entire process of notifying customers of a safety, emissions, or other service-related repairs, and making the necessary repairs or adjustments to all vehicles specifically affected.

**Carrier Delivery Receipt (CDR)**   A form used by most transportation carriers to document vehicle receipt and the results of the receiving inspection. Each vehicle being shipped has its own CDR.

**Chargeback**   An action taken by Nissan to reverse prior payment of a claim amount which has been subsequently determined to be in non-compliance with Nissan's policies and procedures.

**Claim**   A request for reimbursement for parts, labor, or expenses covered by an Assurance Product.

**Claims Register**   A record of claims submitted to Nissan. The claims register helps the dealership keep track of the status of each claim.

**Clear Coat**   The final coat of paint on a vehicle.

**Code**   A short sequence of numbers and/or letters which stand for specific information. Nissan uses codes in claims administration to indicate exact parts, labor operations, and for other reasons.

**Color Coat**   The paint coat which identifies the color of the vehicle. This coat is below the clear coat.

**Concealed Damage**   Damage to a new vehicle which is not detectable during a regular transportation damage inspection, such as undercarriage damage.

**Coverage Code**   A two-character code used to indicate responsibility for payment or reimbursement of parts, operations, and/or expense items associated with a repair. Coverage codes are assigned for the Work Order Line and Detail items.

**GENERAL INFORMATION SECTION 2**
**TERMS/DEFINITIONS**

| | |
|---|---|
| **Covered Component** | A part of the vehicle which is protected by a warranty or service agreement. |

## D

| | |
|---|---|
| **Damage Code** | A five-digit number code which precisely describes the location, type, and severity of transportation damage to a vehicle. |
| **DBS (Dealer Business System)** | Dealer Business System Communication Suite, including sales, office, warranty, and administration. |
| **DCAL (Dealer Claims Admininstration/ Authorization Limits)** | Dealer Claims Administration/Authorization Limits. Dealers may approve some claims without Nissan approval. DCAL privileges and limits are established by Nissan. |
| **Dealer Obligor** | See "Obligor" |
| **Dealer Net** | The cost paid by a dealer for a replacement part. This amount does not include markup. |
| **Debit** | See "Chargeback" |
| **Deductible** | An amount paid by the customer for a service agreement claim or some limited warranties. |
| **Delayed Notification of Inspection** | If a vehicle cannot be inspected for transportation damage immediately upon delivery to the dealership, that fact is noted on the delivery documents. A notification must be written within 48 hours after it is inspected if transportation damage is found. |
| **Delivery Document** | A document used to note transportation damage when it is checked at the dealership. It may be a form used by the carrier. Examples are "Carrier Delivery Receipt" and "Straight Bill of Lading". |
| **Denied Claim** | A claim recorded in the claims payment system which was refused for payment by Nissan. |
| **Diagnosis Code** | A two-character code assigned by the Technician to describe what was found wrong with the vehicle. |
| **Diagnostic Time** | The time required to determine the cause of a customer complaint. |

**GENERAL INFORMATION SECTION 2**
**TERMS/DEFINITIONS**

## E

| | |
|---|---|
| **Expense Code** | A three-digit code used to record supply and service expenses associated with a repair. These expenses include items such as engine oil, brake fluid, paint, towing, rental car, etc. |

## F

| | |
|---|---|
| **Flat Rate Time** | The time (established by Nissan) required to perform a labor operation. |
| **Flagged** | A notation of Technician(s) labor time posted to the Work Order hard copy. |
| **Foreign Distributor** | Any distributor outside the United States who is not an associate distributor. |
| **FRT** | See "Flat Rate Time" |

## G

| | |
|---|---|
| **Goodwill** | Efforts by the dealer and Nissan to enhance customer loyalty. Goodwill efforts are made on a case-by-case basis. |

## H

| | |
|---|---|
| **Hard Copy** | The Technician's copy of the Work Order containing the Technician's notes. |
| **Header Data** | The information taken from the Work Order that describes the customer, the vehicle, and the dealer. This information applies to all Work Order Lines associated with the Work Order. |

## I

| | |
|---|---|
| **Internal Work Order** | A Work Order written to define repairs absorbed by the dealership. |

**GENERAL INFORMATION SECTION 2**
**TERMS/DEFINITIONS**

| | |
|---|---|
| **In-Service Date** | The warranty period begins on the date the vehicle is delivered to the first retail buyer or put into use, whichever is earlier. |

## L

| | |
|---|---|
| **Labor Operation** | A standard repair procedure identified in Nissan's Warranty Flat Rate Manual. Each labor operation specifies the time an average technician, using the proper tools, should take to make the particular repair. |
| **Lienholder** | The person or company who loaned a purchaser money to buy the vehicle and/or service agreement and holds a security interest in the vehicle. |
| **Line Detail** | The specific parts, operations, or expenses associated with a Work Order Line. |
| **Line Type** | A two-character code used to indicate the type of Work Order Line being submitted as a claim. There are currently four Line Types (PP, PO, CM and PD). Also known as "Work Order Line Types." |

## M

| | |
|---|---|
| **Maintenance+Plus** | A pre-paid maintenance agreement available for new Nissan vehicles. The agreement covers vehicle servicing according to maintenance interval, plan level, and duration of agreement. |
| **Manufacturer Obligor** | See "Obligor" |
| **Markup** | An adjustment applied to Dealer Net to allow for reasonable profit. Nissan approved markup is 40% for 1993 and newer models and 30% for earlier models. |
| **Mechanical Breakdown** | The inability of a covered part to perform the function(s) for which it was designed, due solely to defects in materials or faulty workmanship. |
| **MM/DD/YYYY** | The Nissan-preferred way to write a date on a claim using month, day, and year; for example, "June 8, 2018" is written "06/08/2018". |

## GENERAL INFORMATION SECTION 2
### TERMS/DEFINITIONS

| | |
|---|---|
| **Monroney Label** | The sticker which states the manufacturer's suggested retail price of the vehicle and its factory-installed accessories, EPA gas mileage estimates, and other consumer information. |
| **MSRP** | Manufacturer's Suggested Retail Price for parts on new vehicles. |

## N
_____

| | |
|---|---|
| **NDF** | No Defect Found |
| **NCIS** | Nissan Claims Inspection Services |
| **NESNA** | Nissan Extended Service North America |
| **NissanNet** | The electronic data transfer system used to send information between the dealership and Nissan. |
| **NMAC** | Nissan Motor Acceptance Corporation. |
| **NMX** | Nissan Mexicana. |
| **NNA** | Nissan North America, Inc. |

## O
_____

| | |
|---|---|
| **Odometer** | The meter, usually located in the speedometer, which records the elapsed vehicle mileage (or kilometers). |
| **Obligor** | The party ultimately responsible for the payment of claims. Obligated parties can include the dealer, the "Manufacturer" (for example, Nissan, NESNA). |
| **Op Code** | A six-character code that describes the labor operation performed to repair the vehicle. Also known as Operation Code. See "Labor Operation." |

**GENERAL INFORMATION SECTION 2**
**TERMS/DEFINITIONS**

## P

| | |
|---|---|
| **Paint Guard Film (PGF)** | A protective film applied to a vehicle to protect the paint from environmental damage prior to dealer delivery. |
| **Powertrain Call Center (PCC)** | The claims specialized support organization operated by Nissan's Warranty Department. Inquiries regarding Claims Pre- Approval for all CVT Transmission, Engine assemblies, and LEAF Lib warranty and customer pay replacements should be directed to the PCC. Telephone: (800) 973-9992. |
| **Pre-Delivery Inspection (PDI)** | An item-by-item inspection required to be performed on a new vehicle prior to vehicle delivery to the customer. |
| **Primary Failed Part** | The part number of a part which caused a repair action to be needed. |
| **Primary Operation (PO)** | The six-character Op Code that describes the primary work area or item that is adjusted. |
| **Pro-Rata** | A payment schedule based on the amount of service already provided by a battery. Parts subjected to pro-rata adjustment are not eligible for dealer markup. |

## Q

| | |
|---|---|
| **QualityGuard+Plus** | A NESNA administered service agreement that covers selected non-Nissan vehicles. |

## R

| | |
|---|---|
| **R&I (Remove and Install)** | Remove and Install: A standard procedure where a component is removed and the same part is reinstalled. Usually performed to facilitate another repair. |
| **R&R (Remove and Replace)** | Remove and Replace: A standard repair procedure where a component is removed and replaced with a new or remanufactured component. |

## GENERAL INFORMATION SECTION 2
### TERMS/DEFINITIONS

| | |
|---|---|
| **Recall Campaign** | A process by which the manufacturer notifies the owner of a safety- related vehicle defect, and may offer to repair all or part of the defect as part of a "recall campaign". |
| **Refinish** | A paint repair which requires working below the primer coat of paint. See "Clear Coat" and "Color Coat." |
| **Rejected Claim** | A claim which cannot be processed by Nissan. |
| **Repurchased Vehicle (Customer)** | A vehicle acquired into dealer inventory, with Nissan financial assistance, either via auction or vehicle tradeout. |
| **Retail** | The price paid by the retail customer for dealership services or goods. |
| **Retail Delivery Report (RDR)** | Official notification to Nissan of the sale of a vehicle which becomes the effective warranty start date. |

## S

| | |
|---|---|
| **Salvage Title** | A type of brand a State places on a vehicle title associated with a vehicle which was considered a total loss by an insurance company. A vehicle which has (or had) a salvage title is not covered by warranty or service agreement. |
| **Security+Plus** | A NESNA backed service agreement that covers new and pre-owned Nissan vehicles for "mechanical breakdown." |
| **Service Agreement** | A contract between the customer and Nissan which, according to its terms, may cover the cost of parts, labor, or other expenses for a "mechanical breakdown." The customer must apply for a service agreement and Nissan must approve it before it is valid. Sometimes called a "service contract." |
| **Service Contract Pre-Approval Call Center (SCACC)** | A claims specialized support organization operated by NESNA. Inquiries regarding Service Contracts Claims Pre-Approval for CVT Transmission replacement, Engine assembly replacement, and repairs over SC DCAL should be directed to the SCACC. Telephone: 855-456-9544 |
| **Service File** | A dealership file containing a vehicle's service record, including Work Orders, sublet receipts, records of customer contacts, and goodwill offers. Also known as the Vehicle Service History File. |

**GENERAL INFORMATION SECTION 2**
**TERMS/DEFINITIONS**

| | |
|---|---|
| **Service Campaign** | A process by which the manufacturer notifies owners of a non-safety - vehicle defect, and may offer to repair all or part of the defect as part of a "campaign." |
| **Split Coverage** | A claim situation in which the responsibility for payment is shared among two or more parties (e.g., dealer, customer, Nissan). Coverage may be split or shared within the Line Detail (for example, of four parts replaced, two may be covered by the factory, one by the dealer, and one by the customer). |
| **Straight Time** | Separately documented time charged for a labor operation not covered by a flat rate operation. Straight time may be used for repairs for which there are no Op Code/FRT's available. Additionally, straight time should be used to accommodate repairs where the technician does not completely perform a flat rate operation as described in the complete operation description, or where unforeseen problems occur when completing a repair. |
| **Sublet** | Labor operations subcontracted by the dealership to another business. |
| **Suspended Application** | A service agreement application which has been submitted for processing but is incomplete. Dealers are notified of suspended applications and are responsible for correction and resubmission. |
| **Suspended Claim** | Claims which have been received by Nissan but not approved are called "suspended." They are being reviewed, returned, or corrected. |
| **Symptom Code** | A two-character code assigned by the Service Advisor to describe what the customer said was wrong with the vehicle. |

# T

| | |
|---|---|
| **Table Download** | A process in the New Claims System where specific claim-related data tables are copied from the Host system for use by the dealership in-house system. Once "downloaded," the dealership local tables must be updated with the new data. |
| **Time Stamp** | A clocking indicator (for each repair) on a Work Order indicating the time a Technician started and ended work on a repair. |

**GENERAL INFORMATION SECTION 2**
**TERMS/DEFINITIONS**

| | |
|---|---|
| **Transfer** | An Assurance Product may be bought or sold. A transfer happens when the ownership of an Assurance Product changes hands. |
| **Transportation Claim** | A claim prepared and submitted by the dealer to recover costs of repairing vehicle damage caused by the transportation company. Transportation damage claims are between the dealership and the carrier company which transported the vehicle to the dealership. Nissan coordinates these claims as a courtesy to dealers. |

## U

| | |
|---|---|
| **Undercarriage** | Underside of the vehicle. |

## V

| | |
|---|---|
| **Vehicle Transportation Claims Program** | A program by which Nissan assists the dealer in filing a transportation claim. |
| **VIN** | Vehicle Identification Number. |
| **VOR (Vehicle Off Road)** | A condition wherein a vehicle is not considered safely drive-able. This condition is typically cause for expediting required parts. |

## W

| | |
|---|---|
| **Warranty** | A contract between the manufacturer and retail purchaser generally concerning service and repair of vehicles and parts. Warranties applicable to Nissan vehicles are defined in the Warranty Information Booklet provided with each vehicle. |
| **Warranty Claims Call Center (WCCC)** | The claims administrative support organization operated by Nissan's Warranty Department. Inquiries regarding general Claim Pre- Approval, repairs over DCAL, Claim Coding Assistance, and Claim Debit/Credit Adjustments should be directed to the WCCC (800) 258-7008. |

## GENERAL INFORMATION SECTION 2
### TERMS/DEFINITIONS

| | |
|---|---|
| **Warranty Information Booklet** | A booklet detailing the Nissan limited warranties and may refer to warranties covered by others which are given to the customer at the time the vehicle is purchased. |
| **Warranty Statements** | Terms of the warranties listed in the Warranty Information Booklet. Replacement part Warranty Statements are located in NNAnet (My Documents – Warranty – Warranty Statements) for retailers to print and to supply to customer's with purchased parts |
| **Wholesale** | The price charged by a distributor to a retailer. |
| **Work Order** | The form on which an inspection, a repair, or a maintenance operation is initiated and billed to the retail customer, the manufacturer, or internal to the dealership. |
| **Work Order Line** | The portion of a claim which corresponds to a single job or repair action recorded on a Work Order. For Work Orders having multiple repairs, each repair is considered a separate Work Order Line. Also known as a "Line." |

Case 6:20-cv-01625-RBD-GJK   Document 40-1   Filed 07/09/21   Page 25 of 25 PageID 405
USCA11 Case: 23-11027      Document: 27    Date Filed: 08/09/2023     Page: 29 of 119

**WARRANTY SECTION 1**
**POLICIES AND PROCEDURES MANUAL**

# WARRANTY POLICIES AND PROCEDURES MANUAL

## PUBLICATION

This Warranty Policies and Procedures Manual replaces all previous editions of the manual. This manual constitutes the "Warranty Manual" specified in Section I(T) and Section 5 of the Standard Provisions of the Nissan Dealer Sales and Service Agreement (Agreement). As specified in the Agreement, warranty repairs and such other inspections, repairs, service or corrections to Seller's (as defined in the Agreement) products as may be approved or authorized by Seller to be made at Seller's expense shall be performed in accordance with the provisions of this manual.

## ASSURANCE PRODUCTS RESOURCE MANUAL

In response to dealer requests to develop a more user-friendly claims administration process, Nissan North America, Inc. (Nissan) has promulgated an Assurance Products Resource Manual which, in general, provides dealers with a single source of applicable policies and procedures pertaining to administration of Nissan warranties and F&I Products.

## INCORPORATION

Dealers are to perform all service, repair and other obligations required by the Agreement in accordance with the policies and procedures specified in the Nissan Assurance Products Resource Manual which is hereby incorporated by reference into this Warranty Policies and Procedures Manual.

# DE 47-1

warranty ◊ f&i products ◊ pre-owned ◊ system ◊ new vehicle

# Assurance Products Resource Manual

**APRM2020-JANUARY**

NISSAN NORTH AMERICA, INC.

**GENERAL INFORMATION SECTION 2**
**TERMS/DEFINITIONS**

## E

| | |
|---|---|
| **Expense Code** | A three-digit code used to record supply and service expenses associated with a repair. These expenses include items such as engine oil, brake fluid, paint, towing, rental car, etc. |

## F

| | |
|---|---|
| **Flat Rate Time** | The time (established by Nissan) required to perform a labor operation. |
| **Flagged** | A notation of Technician(s) labor time posted to the Work Order hard copy. |
| **Foreign Distributor** | Any distributor outside the United States who is not an associate distributor. |
| **FRT** | See "Flat Rate Time" |

## G

| | |
|---|---|
| **Goodwill** | Efforts by the dealer and Nissan to enhance customer loyalty. Goodwill efforts are made on a case-by-case basis. |

## H

| | |
|---|---|
| **Hard Copy** | The Technician's copy of the Work Order containing the Technician's notes. |
| **Header Data** | The information taken from the Work Order that describes the customer, the vehicle, and the dealer. This information applies to all Work Order Lines associated with the Work Order. |

## I

| | |
|---|---|
| **Internal Work Order** | A Work Order written to define repairs absorbed by the dealership. |

**GENERAL INFORMATION SECTION 2**
**TERMS/DEFINITIONS**

| | |
|---|---|
| **In-Service Date** | The warranty period begins on the date the vehicle is delivered to the first retail buyer or put into use, whichever is earlier. |

## L

| | |
|---|---|
| **Labor Operation** | A standard repair procedure identified in Nissan's Warranty Flat Rate Manual. Each labor operation specifies the time an average technician, using the proper tools, should take to make the particular repair. |
| **Lienholder** | The person or company who loaned a purchaser money to buy the vehicle and/or service agreement and holds a security interest in the vehicle. |
| **Line Detail** | The specific parts, operations, or expenses associated with a Work Order Line. |
| **Line Type** | A two-character code used to indicate the type of Work Order Line being submitted as a claim. There are currently four Line Types (PP, PO, CM and PD). Also known as "Work Order Line Types." |

## M

| | |
|---|---|
| **Maintenance+Plus** | A pre-paid maintenance agreement available for new Nissan vehicles. The agreement covers vehicle servicing according to maintenance interval, plan level, and duration of agreement. |
| **Manufacturer Obligor** | See "Obligor" |
| **Markup** | An adjustment applied to Dealer Net to allow for reasonable profit. Nissan approved markup is 40% for 1993 and newer models and 30% for earlier models. |
| **Mechanical Breakdown** | The inability of a covered part to perform the function(s) for which it was designed, due solely to defects in materials or faulty workmanship. |
| **MM/DD/YYYY** | The Nissan-preferred way to write a date on a claim using month, day, and year; for example, "June 8, 2018" is written "06/08/2018". |

**WARRANTY SECTION 1**
**POLICIES AND PROCEDURES MANUAL**

# WARRANTY POLICIES AND PROCEDURES MANUAL

### PUBLICATION

This Warranty Policies and Procedures Manual replaces all previous editions of the manual. This manual constitutes the "Warranty Manual" specified in Section I(T) and Section 5 of the Standard Provisions of the Nissan Dealer Sales and Service Agreement (Agreement). As specified in the Agreement, warranty repairs and such other inspections, repairs, service or corrections to Seller's (as defined in the Agreement) products as may be approved or authorized by Seller to be made at Seller's expense shall be performed in accordance with the provisions of this manual.

### ASSURANCE PRODUCTS RESOURCE MANUAL

In response to dealer requests to develop a more user-friendly claims administration process, Nissan North America, Inc. (Nissan) has promulgated an Assurance Products Resource Manual which, in general, provides dealers with a single source of applicable policies and procedures pertaining to administration of Nissan warranties and F&I Products.

### INCORPORATION

Dealers are to perform all service, repair and other obligations required by the Agreement in accordance with the policies and procedures specified in the Nissan Assurance Products Resource Manual which is hereby incorporated by reference into this Warranty Policies and Procedures Manual.

**WARRANTY SECTION 2**
**POLICIES**

## 2.1.4: Nissan-Approved Claims

The following details the steps to take when a claim exceeds the dealer's DCAL limits:

| Steps | Task | Responsibility |
|-------|------|----------------|
| 1 | Verify the approval requirement per Nissan policy or as instructed by the Claims Call Center | Service Advisor/Service Manager/Claims Administrator |
| 2 | Complete the Claims Pre-Approval Checklist form then contact the Claims Call center to explain the need for approval. | Service Advisor /Service Manager/Claims Administrator |
| 3 | Perform the repair (if approved) | Technician |

Any claim physically approved or reviewed at the dealer, by a field representative, must be signed in full and dated by the individual issuing the approval.

## 2.2: Reimbursements

Nissan reimburses dealers for warranty repairs and service according to specific criteria and guidelines. Additionally, there are repair situations for which dealers should not request reimbursement.

### 2.2.1: Labor Allowances

Nissan reimburses dealers for labor involved in performing warranty repairs. This reimbursement is based on the dealer's approved warranty labor rate and the Nissan warranty flat rate associated with the repair.

### 2.2.2: Flat Rate Reimbursement

The total amount a dealer can charge Nissan is based on labor flat rates specified in the Nissan Warranty Flat Rate Manual (or amending bulletins/electronic mail notices).

To calculate this amount, multiply the flat rate by the dealer's current, Nissan approved labor rate. Claimed operation code(s) must be consistent with the repair performed and/or parts replaced. Dealers are allowed the flat rate time that is current at the time the claim is opened.

Dealers may request re-evaluation of an existing warranty flat rate time that is believed to be inadequate. They may also request establishment of a new warranty flat rate if the labor operation is one which would normally be warrantable but is not listed in the current Nissan Warranty Flat Rate Manual.

Submit requests to the Nissan Regional Office, using the Suggested Flat Rate Change Form (S-40-S). In all cases, Nissan will inform dealers in writing of the re-evaluation results.

If Nissan's re-evaluation substantiates a new warranty flat rate, a revision to the Nissan Warranty Flat Rate Manual will be published in amending bulletins.

### 2.2.3: Parts Allowances

Genuine Nissan Parts which have been supplied by Nissan for use on Nissan vehicles are reimbursed as follows:

- The price is the Dealer Net Price (less any applicable core value) in effect as of the Work Order Open Date.

- Add a 40% markup over dealer net cost on Genuine Nissan Parts for customer authorized Work Orders for 1993 and newer models. For all other Work Orders, the markup is 30%.

## 2.24: Work Order Responsibilities

During the claims life cycle, many individuals have specific responsibilities and provide specific information on the Work Order. These responsibilities are described in this section under the job titles typically assigned these duties: the Service Manager, the Service Advisor, the Dispatcher, the Technician, the Parts Department, the Nissan Representative, the Cashier, and the Claims Administrator. All of these responsibilities must be carried out regardless of whom the dealer assigns to each.

Additionally, regardless of who at the dealer completes the Work Order, incorrect or inaccurate information may result in chargeback.

> Note: The responsibilities detailed below for Work Order completion and processing are NOT all-inclusive. Additional responsibilities and procedures exist for special Work Order situations and are detailed later in this section.

## 2.25: Time Clocking Requirement

Labor time is a crucial component of a dealer's productivity. The acceptable methods for tracking labor time are 1) using a manual time clock which accurately records date and time (Time Clocking) that is legible or 2) an electronic work order system that accurately records the times, with their allocated descriptions, on the invoice copy of the work order. Proper and accurate time tracking can alleviate possible non-payment of claims. Handwritten time clocking is not acceptable.

Technicians, including technicians working together as a team, are responsible for using a time clock for recording separate, identifiable "clock on" and "clock off" times. All technicians and employees (including salaried employees) who logged time on the work, must be identified by name or employee number, the date and hours worked by each must be logged and legible. Separate, identifiable "clock on" and "clock off" times using a time clock which records, date (month, day & year) and time (including hours, minutes and AM/PM) on the Work Order hard copy are required for each Work Order Line.

All straight time operations require recorded separate, identifiable "clock on" and "clock off" times, the Technician's ID number, the hours flagged, and an explanation or supporting comments to substantiate the time being claimed. These items should be on the back of the hard copy of the Work Order. Straight time should not be claimed for TechLine consultation or perceived inadequate flat rate times.

Nissan may charge back and/or not approve claims when time is not recorded, or the recorded "clock on" and "clock off" times do not reasonably support the time spent working on the vehicle. "Time clocking on file" or similar statements, or elapsed times that do not reasonably support the repair claimed, may result in charge back of the entire claim amount.

## 2.28: Technician Requirements

The Technician is responsible for diagnosing and recording the actual cause(s) of the customer complaint, identifying the part that caused the failure, and the description of the repairs performed to correct the problem.

Regardless if a Technician is working alone, on a team, paid hourly, or paid salary the following is required:

1. A Technician may work on only one vehicle at a time.

2. When the failure of an assembly occurs (e.g., engine, transmission), the Technician must determine the itemized cost to repair the assembly versus the cost of replacement. The itemized list must document a cause of failure of sub-assemblies (i.e. cylinder head). Simply providing an itemized list is inadequate documentation.

3. The Technician must enter the following on the Work Order:

   • The verification of a condition requiring repair, identification of the cause of the condition, and the repair performed to remedy the condition. Specifications, readings, or electrical wiring colors/connector numbers must also be recorded or printed and attached to the Work Order at the time of the repair. This information can also be identified by the Service Manager or other person authorized by the dealer.

   • If diagnostic equipment or tools are used (e.g., CONSULT, wheel alignment, A/C recovery and recharge equipment, battery tester, calipers, run-out gauge), the test results must be printed and attached to the Work Order hard copy. For CONSULT and alignment readings, the printouts must include before the repair is performed and after the repair is completed test results. CONSULT diagnostic tools must be programmed to reflect the actual date and time of diagnosis, and correspond to the Work Order dates.

   Note: Alignment equipment must be calibrated annually, and the calibration certificate retained on file.

   • Specify which repairs were performed by each Technician if more than one Technician worked on the vehicle. Technician comments must be supported by, but not replaced by, diagnostic results, CONSULT printouts, alignment readings, A/C recovery and recharge equipment printouts, battery tester printouts, emission test printouts, copies of Service Manual pages, reference to Technical Service Bulletins, reference to Tech Line contacts and Tech Line incident forms, FIX reference numbers, contacts with appropriate Nissan personnel, or any other related information (such as pressure and stall tests for automatic transmissions; volt/ohm readings for electrical/electronic diagnosis; before and after readings for brake rotor thickness and runout; electrical readings for replacing injectors, etc.).

4. Separate identifiable "clock on" and "clock off" times using a time clock which records, date and time on the Work Order hard copy are required for each Work Order Line . Nissan may chargeback and/or not approve claims when the "clock on" and "clock off" times do not reasonably support the time spent working on the vehicle.

   Note: Maintenance+Plus and Express Service battery replacement work order lines do not require separate "clock on" and "clock off" time recording. All other work order lines require separate identifiable time recording.

**WARRANTY SECTION 2**
**POLICIES**

Technicians working alone:

◦ Any and all technicians performing a warranty repair on a Nissan vehicle will individually "clock on" and "clock off" of each and every Work Order Line which they perform work.

Technicians working together (Team):

◦ If more than one technician performs work on an individual Work Order Line, each and every technician will individually "clock on" and "clock off" of the Work Order Line.

Straight Time:

◦ Straight time operations require "clock on" and "clock off" times, the Technician's number, the hours flagged, and an explanation or supporting comments to substantiate the time being claimed. These items should be on the back of the hard copy of the Work Order. When a Technician does not perform the repair in its entirety as described in the service manual and/or the Warranty Flat Rate Manual, straight time is to be used. The invoice copy of the Work Order must show the date the vehicle came in and the date the work was completed

Work Interruptions:

◦Work interruptions due to breaks or the end of the day etc. must be reflected on the work order by documenting the word  "interrupted", documenting the technician number, the work order line, and printing off the "clock off" time. Resuming of "work interrupted" requires the "clock on" record and a final "clock off" time record once the repair is completed.

5. Any and all technicians (individual and Team) performing a warranty repair on a Nissan vehicle must be properly identified by attaching the appropriate technician number(s) to each Work Order Line in the DMS.

6. Any and all technicians performing a warranty repair on a Nissan vehicle will have successfully completed Nissan's current Technician Training requirements for the warranty repair being performed.

◦ Successful completion of Nissan's online "Technician Orientation" is the minimum standard for any and all technicians performing a warranty repair on a Nissan vehicle.

◦ Any and all technicians performing a warranty repair on a Nissan specialty vehicle which requires a specific certification (GTR, LEAF, etc.) will have successfully completed the required Nissan training for the specific vehicle.

◦ Any and all technicians performing a warranty repair on a subsystem which requires a specific certification (OBDII, Diesel, etc.) will have successfully completed the required Nissan training for the specific subsystem.

◦ If more than one technician performs work on an individual Work Order Line, each and every individual technician must have successfully completed the appropriate training for the repair, or part of the repair, they are performing.

7. The combination of the individual technician's comments on each Work Order Line must accurately represent the work performed and stand alone to substantiate the need for the repair.

8. A Technician is the only person allowed to identify the Primary Failed Part (PFP), but cannot enter part numbers, flat rate time, operation codes, or labor amounts.

9. A Technician cannot add additional repairs to the Work Order.

**WARRANTY SECTION 2**
**POLICIES**

## 2.28.1: Technician Training Requirements

Technicians must have Minimum Service Training Requirements (MSTR) Certification . The MSTR certification is required to receive reimbursement for PDI, warranty, goodwill, campaign, and service contract claims.

Technicians performing engine control system and automatic transmission diagnostic testing on OBDII- equipped vehicles (1998 and later) must be specifically trained and qualified by Nissan in order for the dealer to be reimbursed. The technician code entered on the claim must be for the technician who actually performed the OBDII diagnosis.

Straight time cannot be claimed for Tech-Line contacts or consulting ASIST. Straight time is not to be claimed for what is perceived to be inadequate flat rate times. Refer to Flat Rate Reimbursement procedures (s-40-s form) for requesting a review of a flat rate time believed to be inadequate.

To qualify for claims reimbursement, the OBDII technician must have attained and be current in one or more of the following KEI (Knowledge, Experience, Integrity) levels:

- Engine Specialist
- Senior Specialist (with one specialty being "Engine Specialist")
- Master Technician

Technicians must complete the Intro to Basic Electrical Concepts (BEC) (web-based) and the Nissan & Infiniti Basic Electrical Concepts (Instructor-led) courses before they can be eligible for Diagnostic Flat Rate Time (DFRT) certification.

To complete the DFRT certification, the technician must complete 5 online courses, 2 instructor-led courses, and 2 online post-tests.

The course list for DFRT certification:

- Introduction to CONSULT-III plus Functions (GITC2018-A-OLT) (Web-based)
- Introduction to Engine Control Systems (ECTC9925C) (Web-based)
- Engine Control Systems Operation & Diagnosis (ECTC9926C) (Instructor-led)
- ECS Operations & Diagnosis Post Test (ECTC9926C-PT) (Web-based)
- Introduction to Emission Control Systems (ECTC9927A) (Web-based)
- Introduction to OBD II Systems (ECTC9929A) (Web-based)
- OBD II Systems Diagnosis and Repair (ECTC9931B) (Instructor-led)
- OBD-II Systems Diagnosis and Repair Post Test (ECTC9931B-PT) (Web-based)
- DFRT (OBDII Cert) Specialty Area Update & Recertification (ECTC9932A-MOLT) (Web-based)

## 2.28.2: CVT Specialist Training Claim Requirements

CVT sub-assembly repairs completed under warranty, service contract, goodwill, and campaign repairs will be <u>required</u> to be performed by a Nissan CVT Specialist certified technician for claim payment. Technicians performing CVT sub-assembly repairs must be certified Nissan CVT Specialist, specifically trained and qualified by Nissan, in order for the dealer to be reimbursed.

- Requirement applies only to operation - Replace CVT Sub-Assembly; Op code - JX45AA, JX50AA, JX53AA, and JA54AA

# DE 63

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

JOSE J. AYALA, JR. and
JEFF SANTOS on behalf
of themselves and
as representative of
other class members
similarly situated,
      Plaintiffs,

v.                              Case No. 6:20-cv-01625-RBD-GJK

NISSAN NORTH AMERICA, INC.

      Defendant.

_____/

## DEFENDANT'S ANSWER AND DEFENSES TO
## FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

Defendant Nissan North America, Inc. ("Nissan" or "Defendant") by counsel, submits the following as its Answer and Defenses to Plaintiffs' First Amended Class and Collective Action Complaint (the "Complaint") and states as follows:

## GENERAL ALLEGATIONS[1]

## I.    THE CLASS/COLLECTIVE ACTION REPRESENTATIVES

1.    Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 1 of the Complaint and, on that basis, denies the same.

---

[1] Defendant's use of Plaintiffs' headings is for ease of reference only and should not be construed as an admission of any kind.

2.      Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 2 of the Complaint and, on that basis, denies the same.

3.      Defendant denies the allegations in Paragraph 3 of the Complaint.

4.      Defendant denies the allegations in Paragraph 4 of the Complaint.

5.      Defendant denies the allegations in Paragraph 5 of the Complaint.

6.      Defendant denies the allegations in Paragraph 6 of the Complaint.

7.      Defendant admits that Plaintiffs purport to bring this suit on behalf of themselves and all others similarly situated.  Defendant denies that this case can be certified or maintained as a class or collective action.

8.      Defendant denies the allegations in Paragraph 8 of the Complaint.

## II.    COLLECTIVE ACTION ALLEGATIONS

### A.    Collective Action Members as defined by the Federal Fair Labor Standards Act.

9.      Paragraph 9 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 9 of the Complaint.

10.      Defendant admits that Plaintiffs purport to bring this suit as a collective action under the Fair Labor Standards Act (the "FLSA").  Defendant denies that this case can be certified or maintained as a collective action under the FLSA and denies all allegations in Paragraph 10 of the Complaint not expressly admitted herein.

11.     Paragraph 11 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 11 of the Complaint.

12.     Paragraph 12 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 12 of the Complaint.

13.     Paragraph 13 of the Complaint contains a purported collective definition to which no response is required. To the extent a response is required, Defendant denies that this case can be certified or maintained as a collective action under the FLSA and denies all allegations in Paragraph 13 of the Complaint not expressly admitted herein.

14.     Defendant denies the allegations in Paragraph 14 of the Complaint.

15.     Defendant denies the allegations in Paragraph 15 of the Complaint.

16.     Paragraph 16 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 16 of the Complaint.

## III.   **CLASS ACTION ALLEGATIONS**

**A.     Class Members as defined by the Florida Minimum Wage Act.**

17.     Paragraph 17 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the

allegations in Paragraph 17 of the Complaint.

18.    Defendant admits that Plaintiffs purport to bring this suit as a class action under Fed. R. Civ. P. 23 and the Florida Minimum Wage Act (the "FMWA"). Defendant denies that this case can be certified or maintained as a class action under Fed. R. Civ. P. 23 and the FMWA and denies all allegations in Paragraph 18 of the Complaint not expressly admitted herein.

19.    Paragraph 19 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 19 of the Complaint.

20.    Paragraph 20 of the Complaint contains a purported class definition to which no response is required. To the extent a response is required, Defendant denies that this case can be certified or maintained as a class action under Fed. R. Civ. P. 23 and the FMWA and denies all allegations in Paragraph 20 of the Complaint not expressly admitted herein.

21.    Defendant denies the allegations in Paragraph 21 of the Complaint.

### (i)    Numerosity of the Putative Class

22.    Paragraph 22 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 22 of the Complaint.

### (ii)    Existence of Common Questions of Fact and Law

23.    Paragraph 23 of the Complaint, including Subparagraphs 23(a) – (h), states a legal conclusion to which no response is required.  To the extent a response

is required, Defendant denies the allegations in Paragraph 23 of the Complaint, including the allegations in Subparagraphs 23(a) – (h).

### (iii)    *Typicality*

24.    Paragraph 24 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 24 of the Complaint.

25.    Paragraph 25 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 25 of the Complaint.

### (iv)    *Adequacy*

26.    Paragraph 26 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 26 of the Complaint.

27.    Defendant is without sufficient information to admit or deny the allegations in Paragraph 27 of the Complaint and, on that basis, denies the same.

28.    Paragraph 28 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 28 of the Complaint.

### (v)    *Predominance and Superiority*

29.    Paragraph 29 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the

allegations in Paragraph 29 of the Complaint.

30.     Defendant is without sufficient information to admit or deny the allegations in Paragraph 30 of the Complaint and, on that basis, denies the same.

31.     Paragraph 31 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 31 of the Complaint.

32.     Paragraph 32 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 32 of the Complaint.

33.     Paragraph 33 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 33 of the Complaint.

34.     Paragraph 34 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 34 of the Complaint.

35.     Paragraph 35 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 35 of the Complaint.

36.     Paragraph 36 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the

allegations in Paragraph 36 of the Complaint.

## IV.  <u>THE DEFENDANT – NISSAN NORTH AMERICA, INC.</u>

37.   Defendant denies that it is a California corporation and admits that it has its principal place of business in Franklin, Tennessee.  Responding further, Defendant states that it is a Delaware corporation.

38.   Defendant admits that it manufactures Nissan and Infiniti brand cars, sport utility vehicles and pickup trucks.  Defendant denies the remaining allegations in Paragraph 38 of the Complaint.

39.   Paragraph 39 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies that it was Plaintiffs' "employer" and denies that it is an appropriate defendant in this lawsuit.

40.   Defendant admits the allegations in Paragraph 40 of the Complaint.

41.   Defendant denies the allegations in Paragraph 41 of the Complaint.

42.   Paragraph 42 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies that it was Plaintiffs' "employer" and denies that it is an appropriate defendant in this lawsuit.

43.   Paragraph 43 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies that it was Plaintiffs' "employer" and denies that it is an appropriate defendant in this lawsuit.

44.    Defendant denies the allegations in Paragraph 44 of the Complaint.

45.    Defendant admits that it enters into agreements with independent dealerships.  Defendant denies the remaining allegations in Paragraph 45 of the Complaint.

46.    Defendant denies the allegations in Paragraph 46 of the Complaint.

47.    Defendant denies the allegations in Paragraph 47 of the Complaint.

48.    Defendant denies the allegations in Paragraph 48 of the Complaint.

49.    Defendant denies the allegations in Paragraph 49 of the Complaint.

50.    Defendant denies the allegations in Paragraph 50 of the Complaint.

51.    Defendant denies the allegations in Paragraph 51 of the Complaint.

52.    Defendant denies the allegations in Paragraph 52 of the Complaint, including the allegations in Subparagraphs 52(a) – (m).

53.    Defendant denies the allegations in Paragraph 53 of the Complaint.

54.    Defendant denies the allegations in Paragraph 54 of the Complaint.

55.    Defendant denies the allegations in Paragraph 55 of the Complaint.

## V.    <u>JURISDICTION AND VENUE</u>

56.    Paragraph 56 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 56 of the Complaint.

57.    Paragraph 57 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant does not

dispute that this Court has subject matter jurisdiction over Plaintiffs' claims under the Fair Labor Standards Act.

58.    Paragraph 58 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant does not at this time challenge the Court's supplemental subject matter jurisdiction over Plaintiffs' state law claims.

59.    Paragraph 59 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant does not dispute that venue is proper in this District.

## VI.    NISSAN'S WRONGFUL BUSINESS PRACTICES

60.    Defendant denies the allegations in Paragraph 60 of the Complaint.

61.    Defendant denies the allegations in Paragraph 61 of the Complaint.

62.    Defendant denies the allegations in Paragraph 62 of the Complaint.

63.    Defendant denies the allegations in Paragraph 63 of the Complaint.

64.    Defendant denies the allegations in Paragraph 64 of the Complaint.

65.    Defendant denies the allegations in Paragraph 65 of the Complaint.

66.    Defendant denies the allegations in Paragraph 66 of the Complaint.

67.    Defendant denies the allegations in Paragraph 67 of the Complaint.

68.    Defendant denies the allegations in Paragraph 68 of the Complaint.

69.    Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 69 of the Complaint and, on that basis, denies the same.  Defendant specifically denies that this case can be certified or

maintained as a class or collective action and thus denies the existence of "Class Members."

70.   Defendant denies the allegations in Paragraph 70 of the Complaint.

71.   Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 71 of the Complaint and, on that basis, denies the same.

72.   Defendant denies the allegations in Paragraph 72 of the Complaint.

73.   Defendant denies the allegations in Paragraph 73 of the Complaint.

74.   Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 74 of the Complaint and, on that basis, denies the same.

75.   Defendant denies the allegations in Paragraph 75 of the Complaint.

76.   Defendant denies the allegations in Paragraph 76 of the Complaint.

77.   Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 77 of the Complaint, including the allegations in Subparagraphs 77(a) – (d), and, on that basis, denies the same.

78.   Defendant denies the allegations in Paragraph 78 of the Complaint.

79.   Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 79 of the Complaint, including the allegations in Subparagraphs 79(a) – (c), and, on that basis, denies the same.

80.     Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 80 of the Complaint and, on that basis, denies the same.

81.     Defendant denies the allegations in Paragraph 81 of the Complaint.

82.     Defendant denies the allegations in Paragraph 82 of the Complaint.

83.     Paragraph 83 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 83 of the Complaint.

84.     Paragraph 84 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 84 of the Complaint.

85.     Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 85 of the Complaint and, on that basis, denies the same.

86.     Defendant denies the allegations in Paragraph 86 of the Complaint.

87.     Defendant denies the allegations in Paragraph 87 of the Complaint.

88.     Defendant denies the allegations in Paragraph 88 of the Complaint.

89.     Defendant denies the allegations in Paragraph 89 of the Complaint.

90.     Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 90 of the Complaint and, on that basis, denies the same.

91.     Defendant denies the allegations in Paragraph 91 of the Complaint.

92.     Defendant denies the allegations in Paragraph 92 of the Complaint.

93.     Defendant denies the allegations in Paragraph 93 of the Complaint.

94.     Defendant denies the allegations in Paragraph 94 of the Complaint.

95.     Paragraph 95 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 95 of the Complaint.

96.     Defendant denies the allegations in the first sentence of Paragraph 96 of the Complaint.  The second sentence in Paragraph 96 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in the second sentence in Paragraph 96 of the Complaint.

97.     Paragraph 97 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 97 of the Complaint.

98.     Paragraph 98 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 98 of the Complaint.

## <u>COUNT I</u>
## VIOLATION OF THE FLSA FOR FAILURE TO PAY MINIMUM WAGES
## (COLLECTIVE ACTION AGAINST NISSAN)

99.     Defendant incorporates its responses to Paragraphs 1 - 16 and 37 - 98 of the Complaint as if fully set forth herein.

100.   Defendant admits that Plaintiffs purport to bring this suit as a collective action under the FLSA.  Defendant denies that this case can be certified or maintained as a collective action under the FLSA and denies all allegations in Paragraph 100 of the Complaint, including the allegations in Subparagraph 100(a), not expressly admitted herein.

101.   Paragraph 101 of the Complaint contains a purported collective definition to which no response is required. To the extent a response is required, Defendant denies that this case can be certified or maintained as a collective action under the FLSA and denies all allegations in Paragraph 101 of the Complaint not expressly admitted herein.

102.   Paragraph 102 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 102 of the Complaint.  Defendant specifically denies that this case can be certified or maintained as a collective action under the FLSA such that there could be additional potential opt-in plaintiffs.

103.   Defendant denies the allegations in Paragraph 103 of the Complaint.

104.   Defendant denies the allegations in Paragraph 104 of the Complaint.

105.   Defendant denies the allegations in Paragraph 105 of the Complaint, including the allegations in Subparagraphs 105(a) – (b).

106.   Paragraph 106 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 106 of the Complaint.

107.    Paragraph 107 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 107 of the Complaint.

108.    Defendant admits it has knowledge of the requirements of the FLSA. Defendant denies the allegations in Paragraph 108 of the Complaint not expressly admitted herein.

109.    Defendant denies the allegations in Paragraph 109 of the Complaint.

110.    Defendant denies the allegations in Paragraph 110 of the Complaint.

111.    Paragraph 111 of the Complaint, including Subparagraph 111(a), states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 111 of the Complaint.

112.    Paragraph 112 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 112 of the Complaint.

113.    Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 113 of the Complaint and, on that basis, denies the same.

114.    Defendant denies the allegations in Paragraph 114 of the Complaint.

115.    Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 115 of the Complaint, including the allegations in Subparagraphs 115(a) – (b), and, on that basis, denies the same.

116.    Defendant denies the allegations in Paragraph 116 of the Complaint.

117.    Defendant denies the allegations in Paragraph 117 of the Complaint.

118.    Paragraph 118 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 118 of the Complaint.

119.    Paragraph 119 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 119 of the Complaint.

120.    Paragraph 120 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 120 of the Complaint.

121.    Paragraph 121 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 121 of the Complaint.

122.    Defendant admits that Plaintiffs purport to bring this suit as a collective action under the FLSA.  Defendant denies that this case can be certified or maintained as a class of collective action and denies the allegations in Paragraph 122 of the Complaint not expressly admitted herein.

The paragraph beginning with "**WHEREFORE**" constitutes a prayer for relief to which no response is required.  To the extent a response is required, Defendant denies that Plaintiffs are entitled to the relief they seek or to any relief whatsoever.

## COUNT II
## NISSAN'S VIOLATION OF THE FLSA FOR FAILURE TO PAY OVERTIME WAGES
## (COLLECTIVE ACTION AGAINST NISSAN)

123.    Defendant incorporates its responses to Paragraphs 1 - 16 and 37 - 98 of the Complaint as if fully set forth herein.

124.    Defendant admits that Plaintiffs purport to bring this suit as a collective action under the FLSA.  Defendant denies that this case can be certified or maintained as a collective action under the FLSA.

125.    Paragraph 125 of the Complaint contains a purported collective definition to which no response is required. To the extent a response is required, Defendant denies that this case can be certified or maintained as a collective action under the FLSA and denies all allegations in Paragraph 125 of the Complaint not expressly admitted herein.

126.    Paragraph 126 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 126 of the Complaint.  Defendant specifically denies that this case can be certified or maintained as a collective action under the FLSA such that there could be additional potential opt-in plaintiffs.

127.    Defendant denies the allegations in Paragraph 127 of the Complaint.

128.    Defendant denies the allegations in Paragraph 128 of the Complaint.

129.   Paragraph 129 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 129 of the Complaint.

130.   Paragraph 130 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 130 of the Complaint.

131.   Defendant admits it has knowledge of the requirements of the FLSA. Defendant denies the allegations in Paragraph 131 of the Complaint not expressly admitted herein.

132.   Defendant denies the allegations in Paragraph 132 of the Complaint.

133.   Defendant denies the allegations in Paragraph 133 of the Complaint.

134.   Paragraph 134 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 134 of the Complaint.

135.   Paragraph 135 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 135 of the Complaint.

136.   Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 136 of the Complaint and, on that basis, denies the same.

137.    Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 137 of the Complaint, including the allegations in Subparagraphs 137(a) – (b), and, on that basis, denies the same.

138.    Defendant denies the allegations in Paragraph 138 of the Complaint.

139.    Defendant denies the allegations in Paragraph 139 of the Complaint.

140.    Defendant denies the allegations in Paragraph 140 of the Complaint.

141.    Paragraph 141 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 141 of the Complaint.

142.    Paragraph 142 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 142 of the Complaint.

143.    Paragraph 143 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 143 of the Complaint.

144.    Defendant admits that Plaintiffs purport to bring this suit as a collective action under the FLSA.  Defendant denies that this case can be certified or maintained as a class of collective action and denies the allegations in Paragraph 144 of the Complaint not expressly admitted herein.

The paragraph beginning with "**WHEREFORE**" constitutes a prayer for relief to which no response is required.  To the extent a response is required,

Defendant denies that Plaintiffs are entitled to the relief they seek or to any relief whatsoever.

## COUNT III

### VIOLATION OF FLORIDA'S MINIMUM WAGE ACT FOR FAILURE TO PAY MINIMUM WAGES
### (CLASS ACTION AGAINST NISSAN)

145.   Defendant incorporates its responses to Paragraphs 1 - 8 and 17 - 98 of the Complaint as if fully set forth herein.

146.   Defendant admits that Plaintiffs purport to bring this suit as a class action to recover unpaid minimum wages under the FMWA.  Defendant denies that this case can be certified or maintained as a class action.

147.   Paragraph 147 of the Complaint contains a purported class definition to which no response is required. To the extent a response is required, Defendant denies that this case can be certified or maintained as a class action and denies all allegations in Paragraph 147 of the Complaint not expressly admitted herein.

148.   Defendant denies the allegations in Paragraph 148 of the Complaint.

149.   Defendant denies the allegations in Paragraph 149 of the Complaint.

150.   Defendant denies the allegations in Paragraph 150 of the Complaint, including the allegations in Subparagraphs 150(a) – (b).

151.   Paragraph 151 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 151 of the Complaint.

152.   Paragraph 152 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 152 of the Complaint.

153.   Defendant admits it has knowledge of the requirements of the FMWA. Defendant denies the allegations in Paragraph 153 of the Complaint not expressly admitted herein.

154.   Defendant denies the allegations in Paragraph 154 of the Complaint.

155.   Defendant denies the allegations in Paragraph 155 of the Complaint.

156.   Paragraph 156 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 156 of the Complaint, including the allegations in Subparagraph 156(a).

157.   Paragraph 157 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 157 of the Complaint.

158.   Paragraph 158 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 158 of the Complaint.

159.   Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 159 of the Complaint and, on that basis, denies the same.

160.   Defendant denies the allegations in Paragraph 160 of the Complaint.

161.    Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph 161 of the Complaint, including the allegations in Subparagraphs 161(a) – (b), and, on that basis, denies the same.

162.    Defendant denies the allegations in Paragraph 162 of the Complaint.

163.    Defendant denies the allegations in Paragraph 163 of the Complaint.

164.    Paragraph 164 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 164 of the Complaint.

165.    Paragraph 165 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 165 of the Complaint.

166.    Paragraph 166 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 166 of the Complaint.

167.    Paragraph 167 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 167 of the Complaint.

The paragraph beginning with "**WHEREFORE**" constitutes a prayer for relief to which no response is required.  To the extent a response is required, Defendant denies that Plaintiffs are entitled to the relief they seek or to any relief whatsoever.

## COUNT IV
## UNJUST ENRICHMENT – TOOL AND EQUIPMENT PURCHASES
## (CLASS ACTION AGAINST NISSAN)

168.    Defendant incorporates its responses to Paragraphs 1 - 8 and 17 - 98 of the Complaint as if fully set forth herein.

169.    Defendant denies the allegations in Paragraph 169 of the Complaint.

170.    Defendant denies the allegations in Paragraph 170 of the Complaint.

171.    Defendant denies the allegations in Paragraph 171 of the Complaint.

172.    Defendant denies the allegations in Paragraph 172 of the Complaint.

173.    Paragraph 173 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 173 of the Complaint.

The paragraph beginning with "**WHEREFORE**" constitutes a prayer for relief to which no response is required.  To the extent a response is required, Defendant denies that Plaintiffs are entitled to the relief they seek or to any relief whatsoever.

## COUNT V
## UNJUST ENRICHMENT – FAILURE TO COMPENSATE CLASS
## MEMBERS FOR TIME WORKED
## (CLASS ACTION AGAINST NISSAN)

174.    Defendant incorporates its responses to Paragraphs 1 - 8 and 17 - 98 of the Complaint as if fully set forth herein.

175.    Defendant denies the allegations in Paragraph 175 of the Complaint.

176.    Defendant denies the allegations in Paragraph 176 of the Complaint.

177.   Defendant denies the allegations in Paragraph 177 of the Complaint.

178.   Defendant denies the allegations in Paragraph 178 of the Complaint.

179.   Defendant denies the allegations in Paragraph 179 of the Complaint.

180.   Defendant denies the allegations in Paragraph 180 of the Complaint.

181.   Defendant denies the allegations in Paragraph 181 of the Complaint.

182.   Paragraph 182 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 182 of the Complaint.

The paragraph beginning with "**WHEREFORE**" constitutes a prayer for relief to which no response is required.  To the extent a response is required, Defendant denies that Plaintiffs are entitled to the relief they seek or to any relief whatsoever.

### COUNT VI
### UNJUST ENRICHMENT – OVERTIME
### (CLASS ACTION AGAINST NISSAN)

183.   Defendant incorporates its responses to Paragraphs 1 - 8 and 17 - 98 of the Complaint as if fully set forth herein.

184.   Defendant denies the allegations in Paragraph 184 of the Complaint.

185.   Defendant denies the allegations in Paragraph 185 of the Complaint.

186.   Defendant denies the allegations in Paragraph 186 of the Complaint.

187.   Defendant denies the allegations in Paragraph 187 of the Complaint.

188.   Defendant denies the allegations in Paragraph 188 of the Complaint.

189.   Defendant denies the allegations in Paragraph 189 of the Complaint.

190.    Defendant denies the allegations in Paragraph 190 of the Complaint.

191.    Paragraph 191 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 191 of the Complaint.

The paragraph beginning with "**WHEREFORE**" constitutes a prayer for relief to which no response is required.  To the extent a response is required, Defendant denies that Plaintiffs are entitled to the relief they seek or to any relief whatsoever.

## PRAYER FOR RELIEF

The section of the Complaint under the heading "PRAYER FOR RELIEF" constitutes a prayer for relief to which no response is required.  To the extent a response is required, Defendant denies that Plaintiffs are entitled to the relief they seek or to any relief whatsoever.

## JURY TRIAL DEMANDED

The section of the Complaint under the heading "JURY TRIAL DEMANDED" constitutes a demand for a jury trial to which no response is required.

## GENERAL DENIAL

Defendant denies each and every allegation of fact and conclusion of law asserted in the Complaint that has not been expressly admitted in the foregoing numbered paragraphs.

## AFFIRMATIVE AND OTHER DEFENSES

WHEREFORE, having fully answered the allegations set forth in Plaintiffs' Complaint, Defendant offers the following affirmative and other defenses, without admitting that it bears the burden of proof as to each of them:

1.      Plaintiffs' Complaint fails, in whole or in part, to state a claim upon which relief may be granted.

2.      Plaintiffs' claims fail, in whole or in part, because Defendant was not Plaintiffs' "employer" under applicable law.

3.      Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, estoppel, laches, unclean hands, and accord and satisfaction.

4.      Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations.

5.      Plaintiffs' state law claims are barred, in whole or in part, by federal preemption.

6.      Plaintiffs' claims are barred, in whole or in part, by the doctrines of judicial or equitable estoppel, including, but not limited to, for failure to disclose claims in bankruptcy.

7.      Some or all of the claims for which Plaintiffs seek compensation are barred by the *de minimis* work doctrine.

8.      Some or all of the claims for which Plaintiffs seek compensation are not compensable under the FLSA or the FMWA.

9.     Plaintiffs' claims are barred, in whole or in part, by their failure to timely report their alleged compensable work activities.

10.    All actions taken by Defendant were taken in good faith and with reasonable grounds for believing that they were not in violation of the FLSA or the FMWA.

11.    Any actions by Defendant did not recklessly disregard or willfully violate the FLSA or the FMWA.

12.    Plaintiffs have failed to satisfy the prerequisites of class certification under Rule 23 of the Federal Rules of Civil Procedure and, therefore, lack standing and cannot represent the interests of others.

13.    Plaintiffs have failed to satisfy the prerequisites of collective certification under the FLSA and, therefore, lack standing and cannot represent the interests of others.

14.    Some or all members of the putative class or collective action are properly classified as exempt from the FLSA's minimum wage and overtime requirements.

15.    Without assuming the burden of proof, Plaintiffs and members of the purported collective action are not similarly situated.

16.    Without assuming the burden of proof, Plaintiffs and members of the purported class action are not sufficiently similar to warrant class certification.

17.    Some of the putative class and/or collective members may be parties to valid settlement or other agreements, the terms of which include a resolution of

all claims that the putative class and/or collective members may have against Defendant, including the claims alleged in the complaint.  Therefore, some of the putative class and/or collective members are not entitled to any relief.

18.    Plaintiffs' proposed class and collective definitions are overly broad to the extent they include putative class and/or collective members whose claims have been resolved through valid settlement or other agreements with Defendant, which include a resolution of all claims that the putative class members may have against Defendant, including the claims alleged in the complaint.

19.    Defendant reserves the right to amend this Answer and/or plead additional defenses as additional information is obtained through further investigation and discovery.

Dated: November 24, 2021.

MCGUIREWOODS LLP

*/s/ Thomas R. Brice*
Thomas R. Brice
Florida Bar No. 0018139
tbrice@mcguirewoods.com
50 North Laura Street, Suite 3300
Jacksonville, Florida 32202
Telephone: (904) 798-2629
Facsimile: (904) 360-6335

Peter N. Farley (Virginia Bar No. 34592)
Christopher M. Michalik (Virginia Bar No. 47817)
Igor Babichenko (Virginia Bar No. 78255)
Admitted *pro hac vice*
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel: 804-775-1000
Fax: 804-775-1061
Email: pfarley@mcguirewoods.com
Email: cmichalik@mcguirewoods.com
Email: ibabichenko@mcguirewoods.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2021, a true copy of the foregoing was filed with the Court using the CM/ECF system, which will send notice to all counsel of record.

*/s/  Thomas R. Brice*
Attorney

# DE 66-3

Ex. 2



# Protect your Investment

Each year, more and more sophisticated technology is built into vehicles to improve their safety, performance, comfort and value. These same innovations help to increase the vehicle's reliability. However, if something does go wrong, the necessary repairs can be more complex and costly than they were 5 or 10 years ago.

**0% Consumer Financing Plan Available
No Qualification — Convenient Terms**

**Factory-trained Technicians & Advanced Diagnostic Equipment Maximize Your Nissan's Safety and Reliability**



**Average Repair Estimates***

- Timing Chain $1,380
- Alternator $659
- Engine $9,730
- Air Conditioning $938
- Power Window Motor $261
- Rack & $1,808
- Control Arm $528
- Starter $509
- Transmission $4,164
- Brake Caliper $446
- Fuel Pump $494

*Image is for illustration purposes only. Repair costs are based on the 2020 Altima 2.5L.

- **Protect essential vehicle systems beyond your factory warranty — up to 8 years and 120,000 miles**

- **Convenient and economical coverage that guards against the rising cost of repairs**

- **Superior parts and service designed exclusively for your Nissan**

- **Choose Gold Preferred for the ultimate peace-of-mind protection for your new or pre-owned Nissan**

# Why Security+Plus?

For over 30 years, we've provided **Service You Can Trust** — comprehensive, factory-backed coverage for Nissan Owners and repairs at any authorized Nissan dealership nationwide. With approximately $700 million in annual sales and over two and a half million cars on the road today covered by our products, we are one of the largest service contract providers in the automotive marketplace.

## How am I protected?

Your Nissan vehicle warranty is very comprehensive. It covers virtually every part in your vehicle and can help prevent you from paying expensive repair bills. Only one problem — it ends. And when it does, you could be exposed to unexpected repair costs. A Security+Plus Extended Protection Plan can protect your investment and your pocketbook when your factory warranty expires.



## Guard against the rising cost of repairs

The average age of cars and light trucks currently in operation in the U.S. has increased to 11.8 years.* As your vehicle gets older, both the risk and cost of repairs may increase.

Our contract terms and options provide you with an unparalleled value, right now.

- **Choice of plan level that best suits you** with $0 or $100 deductible, per visit
- **Payment-free service, other than your deductible** Dealers are paid directly
- **Transferable** if you sell before your coverage expires; helps enhance resale value†
- **Wide Range of Term Options** available for both New and Pre-Owned
- **Customer Assistance** throughout the United States at any Nissan dealer or by calling 800-NISSAN-1



## Additional Benefits

Start immediately and help to create a worry-free driving experience:

- **Emergency Roadside Assistance** 24 hours a day, 365 days a year with no deductibles for the services shown to the right, or for dispatch towing service
- **Trip Interruption‡** Reimbursement for alternate transportation, meals and lodging when you are 100 miles or more from home§
- **Car Rental Assistance‡** Reimbursement for up to $35/day for five (5) days§
- **Towing‡** Reimbursement up to $100 per claim§



Over 50% of all Roadside Assistance calls are due to non-mechanical issues.

---

* Source: IHS Markit
† A nominal transfer fee may apply.
‡ Gold Preferred and Silver Preferred Plans only
§ Should you have a mechanical breakdown of a covered component

** Based on Security+Plus Repair Records through October 2019. Your experience may be different. Information based on original compilation date.

Note:
Turbocharger, Supercharger, Diesel Engine and AWD/4WD are covered only if the applicable option was selected on the Security+Plus Application/Declaration at the time of purchase and the required surcharge paid.

# Plan Coverage Comparison††

| **GOLD PREFERRED** | **COVERAGE SO EXTENSIVE, ONLY A FEW ITEMS ARE NOT COVERED:** Virtually all major components of your Nissan are covered, including Advanced Driver Assistance Systems (ADAS) – exceptions are limited to normal maintenance services and a few components listed on the service contract, providing you with an unprecedented level of exclusionary coverage and a truly worry-free driving experience. |
|---|---|

| **SILVER PREFERRED** | Includes all components covered by Powertrain Preferred, plus another 680+ essential components and three Additional Benefits: Trip Interruption, Car Rental, and Towing reimbursement |
|---|---|

 **AUDIO/VIDEO/NAVIGATION**
OEM audio, video and navigation components.

 **SUSPENSION**
Rear axle beam and electric adjustable shock absorbers.

 **STEERING**
Power steering pump and reservoir tank, and belts and hoses.

**ELECTRICAL**
Manually and mechanically operated switches, relays, sensors, electronic instrument cluster, electronic driver information display and module (head up display unit), drive computer display, washer motor, power window motors and regulators, power door locks, power seat motors, sunroof motor, power mirror motors and actuators, keyless entry (excludes immobilizer key and remote keyless entry switch assembly), O.E.M anti-theft system, computer units.

 **NISSAN AIR CONDITIONING (OEM ONLY)**
Temperature control programmer, blower motor, heater core, and belts and hoses.

 **BRAKES**
Anti-lock braking system, and belts and hoses.

**CAR RENTAL REIMBURSEMENT**
If you require alternate transportation due to the MECHANICAL BREAKDOWN of a covered part, reimbursement for the actual expenses of substitute transportation up to $35 per day are included, to a maximum of five (5) days, and $175 per breakdown. Rental must be made from an authorized rental agency or your repairing Nissan dealer.

 **TOWING**
If your vehicle requires towing due to the MECHANICAL BREAKDOWN of a covered part, reimbursement for the actual towing expense incurred in towing it to the nearest participating Nissan dealer will be covered, not to exceed $100 per claim.

 **TRIP INTERRUPTION BENEFITS**
Emergency travel/trip interruption coverage is provided should any MECHANICAL BREAKDOWN occur when you are 100 miles or more away from home, up to $500 per claim. Benefits may apply to the occurrence of the following expenses: alternate transportation, meals and lodging.

| **POWERTRAIN PREFERRED** | Covers repairs needed due to the mechanical breakdown of 840+ components. Your peace of mind includes Emergency Roadside Assistance 24 hours a day, 7 days a week, 365 days a year |
|---|---|

 **SUSPENSION**
Strut assemblies, upper and lower control arms (links/transverse links) and bushings, tension/compression rods and bushings, stabilizer bars and bushings, connecting rods and bushings, rear arm assembly, torsion bars, upper and lower ball joints, wheel bearings and seals, knuckle spindle, hubs, king pins and bearings, front coil and leaf springs.

 **STEERING**
Steering gear housing(s) and all internal parts, rack and pinion assembly, power steering pump, steering column main and upper shafts, steering linkages and couplings, HICAS power cylinder assembly and all internal parts, and seals and gaskets.

 **ELECTRICAL**
Starter motor and solenoid, alternator, voltage regulator, ignition coil, distributor, ignition switch and module, transistor ignition unit, electronic spark control detonation sensor and controller, wiring harness, horn and windshield wiper motor.

 **FUEL SYSTEM**
Fuel pump(s), electro injection unit, electronic fuel injection sensors, control units, injectors, fuel tank and lines, and seals and gaskets.

 **BRAKES**
Master cylinder, vacuum assist booster, wheel cylinders, disc calipers, hydraulic valves, lines and fittings, and seals and gaskets.

 **NISSAN AIR CONDITIONING (OEM ONLY)**
Compressor, clutch and pulley, condenser, evaporator, receiver dryer, and seals and valves.

**24-HOUR EMERGENCY ROADSIDE ASSISTANCE**
"Sign and Drive" service up to $100 per claim with no deductible for battery boost, lock out, fuel delivery, tire services or for dispatch towing service.

Your vehicle's factory Limited Powertrain Warranty covers only those components listed in RED text.

 **ENGINE**
Cylinder block, head(s) and all internal parts, timing gears, tensioner(s), timing chain or belt and cover(s), harmonic balancer (crankshaft pulley), manifolds and collector(s), oil pump, valve cover(s), oil pan, drive plate, flywheel ring gear and engine mounts, turbocharger housing and internal parts, turbocharger valves and actuator, radiator, fan and fan coupling, fan motor, water pump, and seals and gaskets.

**TRANSMISSION**
Transmission case(s) and all internal parts including the torque converter, vacuum modulator, electric control units, oil pan, transmission mounts, transfer case and all internal parts, and seals and gaskets.

**FRONT WHEEL DRIVE**
Final drive housing and all internal parts, constant velocity joints (slide joint spider assemblies), and seals and gaskets. Note: constant velocity boots are excluded from coverage.

**REAR WHEEL DRIVE AND FOUR WHEEL DRIVE**
Rear drive axle housing and all internal parts, propeller shaft(s), universal joints (journal assemblies), axle shafts, axle bearings and retainers, free running hubs, constant velocity joints (spider assemblies), and seals and gaskets. Note: constant velocity boots are excluded from coverage.

Silver Preferred and Powertrain Preferred VSC covers the cost of mechanical breakdown of the parts listed above after your vehicle's warranty expires.

†† Covered components are subject to change. For complete information concerning components covered, and those components which are excluded from coverage, please refer to the Security+Plus Vehicle Service Contract or contact your Nissan dealer.

## Component Coverage†

| VEHICLE SYSTEMS | Gold Preferred | Silver Preferred | Powertrain Preferred |
|---|---|---|---|
| | Totals May Vary by Model & Year | | |
| Engine | 415 | 302 | 228 |
| Transmission | 453 | 372 | 325 |
| Drive Axle (FWD/RWD/AWD) | 108 | 102 | 94 |
| Brakes | 112 | 60 | 21 |
| Electrical | 321 | 247 | 21 |
| Advanced Driver Assistance Systems | 51 | 0 | 0 |
| Fuel System | 70 | 44 | 26 |
| Steering | 99 | 68 | 49 |
| Suspension | 124 | 70 | 65 |
| Air Conditioning/Heater | 137 | 89 | 20 |
| Body & Interior | 276 | 96 | 0 |
| Audio/Video/Navigation | 69 | 69 | 0 |
| **TOTAL** | **2200+** | **1500+** | **840+** |

### The Gold Preferred Plan and Exclusionary Coverage:

Silver Preferred and Powertrain Preferred plans cover the repair cost for mechanical breakdown of the parts listed on the Security+Plus Vehicle Service Contract (VSC) after your vehicle's warranty expires.

The Gold Preferred plan offers exclusionary coverage, the highest level of coverage that a vehicle qualifies for once it is outside the manufacturer's warranty. There is only a small list of excluded parts, shown on the VSC, consisting of but not limited to: Regular Maintenance, Cosmetic items, and Physical Damage. For example, normal wear-and-tear items are not included, like wiper blades, tires, lights, and batteries.

Covered components are subject to change. Please refer to the Security+Plus Vehicle Service Contract or contact your Nissan dealer for details concerning components covered and those components which are excluded from coverage.

Disclaimer:
THIS BROCHURE, WHICH IS LIMITED BY SIZE, IS NOT A CONTRACT. READ A SAMPLE SECURITY+PLUS CONTRACT AT YOUR DEALER, AND READ YOUR ACTUAL SERVICE CONTRACT BECAUSE ITS TERMS, CONDITIONS, EXCLUSIONS, AND LIMITATIONS CONTROL.

Notice:
In compliance with federal laws, the contents of this brochure should be interpreted and understood within the meaning of a "Service Contract" as defined in Federal Law. (See 15 USCS Sec. 2301 (8).)

**In Florida, Security+Plus is backed by Nissan Extended Services North America, Inc., P.O. Box 685004, Franklin, TN 37068–5004. License #60128.**

†Replacement of any part will be made with a new or remanufactured Genuine Nissan or Nissan-approved replacement part in use at the time of repair. The replacement part may differ from the original part.

Nissan, the Nissan Logo and Nissan Model Names are Nissan Trademarks.
©2020 Nissan  800-NISSAN-1

owners.nissanusa.com/Security+Plus

SECEPP-1120

# DE 67-1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Ex. 1.1

JOSE J. AYALA, JR. and JEFF
SANTOS, on behalf of
themselves and as
representatives of other class
members similarly situated,

     Plaintiffs,

v.

NISSAN NORTH AMERICA, INC. D/B/A
NISSAN USA, a California corporation, a
wholly owned subsidiary of Nissan Motor
Company of Japan,

     Defendant.

_____/

Case No.: 6:20-cv-01625-RBD-GJK

## DECLARATION OF JOSE J. AYALA, JR.

     I, Jose J. Ayala, Jr. declare, based upon personal knowledge and under penalty

of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

**EMPLOYMENT HISTORY/ FACTS TOWARDS JOINT EMPLOYER /
OTHERS WHO EXPERIENCED SIMILAR ISSUES**

1.    I was formally employed by Sutherlin Nissan in Orlando, Florida from

approximately 2011 – 2019. That dealership is located at 8125 E. Colonial Dr.,

Orlando, FL 32817. I was employed as an Automotive Technician and Team Leader

and paid as a nonexempt employee.

2.    I was formally employed by Reed Nissan of Clermont from approximately 2019

through the first week of March 2020. The dealership was located at 16005 State Rd.

50, Clermont FL 34711. I was employed as a Service Technician and paid as a nonexempt employee.

3.  While at both dealerships identified above, I was a Nissan certified technician that was employed and required to conduct warranty work on Nissan manufactured vehicles, which required that I submit Nissan required paperwork to my dealership and Nissan corporate for payment and approval.

4.  To be more specific, it was common knowledge at all dealerships that in order for any technician to be paid for the work that she or he performed, the technician had to follow all of the processes and procedures required by Nissan corporate (and not the dealership) in terms of how work was performed, the time requirements for performing the work, the documents that must be submitted to corporate through the electronic submission process established and controlled by corporate, among other things. Everyone knew that corporate controlled this process and that if we did not comply with corporate's processes and requirements, this would affect our compensation, among other issues that it could create for both the dealership and the employee.

5.  Employees were always made aware of the fact, and lead to believe, that the compensations process for warranty and other work was dictated by Nissan corporate and not the dealership, which was apparent based on the process that we had to follow in order for both the dealership, and ultimately the employee, to be compensated.

6.  While working at both dealerships identified above, I was required to conduct all maintenance and repair work in accordance and in strict compliance with Nissan

corporate's requirements, both for warranty-work Nissan vehicles and customer-paid vehicles.

7.     Typically, all people who were affected by Nissan's compensation program in this case were generally considered "technicians".

8.     I was required as a condition of my employment to access Nissan corporate's systems such as nnanet.com (Nissan corporate's website/database with bulletins, repair work information and processes, and training/certification information), the *Assurance Products Resource Manual*[1] from Defendant Nissan, physical bulletins, and attend meetings to ensure our work was compliant with standards and procedures set by Nissan corporate. Every dealership I worked with made it clear that in order to maintain my employment and receive compensation, I (along with every other employee in my department) had to comply with all Nissan corporate's requirements, processes, policies, and so forth, and we were required to use Nissan corporate systems and resources to perform our job and maintain our status as certified Nissan technicians – the certification came from corporate and not the local dealership.

9.     We were advised that all work had to be compliant with Nissan corporate's standards and procedures for us to be paid on the work that was conducted; the individual dealerships did not really have any processes, procedures, etc. that were different from those of Nissan Corporate.  In fact, I believe it is fair to say that all

_____

[1] I understand that portions of this manual are attached to the motions for certification filed by my attorney. As technicians we are told and the manual states that it applies to all dealerships and that we must follow if to be paid, especially on warranty-work.

process, procedures, and requirements to perform my job duties were, irrespective of what dealership I worked at, established, and mandated by Nissan corporate and policed by corporate. All other technicians/maintenance/service personnel were required to do the same.

10.    I also refer to and incorporate my amended responses to Defendant Nissan's interrogatories for additional information about the work that I conducted on behalf of Defendant Nissan, for their benefit. *See Exhibit A.*

11.    I am well aware of what several other Nissan technicians/maintenance/service personnel made in their wages, the hours they worked, the compensation, and the systematic behavior of Nissan corporate because I worked and discussed these issues with several others over my lengthy employment with Nissan since 2006, as well were all frustrated by the deficiencies in the compensation we received and the lack of authority our dealerships had to address and resolve these issues. I even know of Nissan technicians outside the state of Florida who have experienced the same issues, which tells me that Defendant Nissan has a wide-ranging and systematic control over the technicians and what is paid to technicians within their partner-dealerships.

12.    The issues we now raise in this lawsuit were the center of discussion on a near weekly basis when we received our paychecks and pay stubs – it was clear to us all that we were rarely compensated for all of the hours we worked, that we rarely received compensation commensurate with our hourly pay rate, and that almost never received compensation for overtime, among other issues and concerns that all of us felt.

13.     I worked at two different Nissan dealerships and the issues were nearly identical and over a large span of time, the same is true of every other Nissan employee, including employees that worked a different dealerships.

14.     While I no longer work with any Nissan dealership, I am still in the automotive service industry and recognize a difference in appropriate compensations programs in the automotive service industries in comparison to the three Nissan dealerships I worked at over an extensive period.

15.     It is also relatively simply to calculate wages owed to me and other people because Nissan established and provides to dealerships and technicians the amount it will pay per job at its "flat rate" for work on the vehicles.

16.     Further, from my experience at the dealerships, Nissan corporate and the dealerships are in frequent conversations about warranty work, what will be paid or not be paid on vehicles, new procedures, recalls, bulletins, training, maintenance issues, and more.

17.     Additionally, I understand that our attorneys will hire experts who will perform simple calculations on a mass scale to determine damages to all personnel in this matter.

**JOB DUTIES ON BEHALF OF NISSAN**

18.     During my time as an automotive/service technician, I typically did these tasks daily:

    a. Diagnosing repairs to the vehicles that came to the dealerships, which
       included both warranty-work under Nissan vehicle warranties/service

agreements and "customer-paid-work". Unfortunately, not all of my work in diagnosing vehicles was paid either in part or in full.

b.  Perform the work required to maintain/repair the vehicles that came into the dealership which included both warranty-work under Nissan vehicle warranties and "customer-paid-work".

c.  Conduct all maintenance and repair work in accordance with Nissan's requirements.

d.  Assist other technicians with certain work and diagnostics on vehicles. Helping others, especially as a team leader, is considered an "unflagged" hour and we would not generally get paid to help another teammate, even when the repair/service on the vehicle required it.

e.  When I was team leader at Sutherlin Nissan, I would have to assist in the distribution of work to other technicians within my "team". The work consisted of both "warranty-work" and "customer-paid-work". None of these hours were considered "flagged" and therefore, I would not be paid for it. I would only be paid as a "team leader" if the team as a whole reached certain goals or exceeded in regional customer survey scores. In other words, "team leader" compensation did not reflect the amount of time actually spent performing the task or role.

f.  Review of bulletins and other manuals/policies/or similar associated with warranty-work vehicles and customer-paid vehicles to ensure compliance with Nissan's standards. Conduct any administrative /compliance work to make sure I followed Nissan's directions for repair/maintenance of vehicles. Again, these requirements are "unflagged hours", but were necessary to complete the job—we were not paid for it.

g.  Documenting and providing information required to Nissan on warranty-work vehicles. Likewise, we were not paid to provide the required information to Nissan on warranty-work vehicles.

h.  Communicating with customers and/or service writers on vehicles and/or vehicle repairs. Even if we communicated with customers or the service writers to assist the customer/vehicle, we were not compensated this time.

    i.   Organizing and cleaning the shop to maintain Nissan's brand standards. We were never paid to do this.

    j.   Organize and clean workspace(s) to maintain Nissan's brand standards and expectations. This was likewise considered unpaid, unflagged hours.

    k.   Assist with other warranty-work issues to ensure compliance with Nissan's standards and to promptly deliver the vehicle to the customer in a reasonable time. If there was any additional work that needed to be done on a vehicle to ensure it made it to  customer on time, we were not paid the extra time we put into the vehicle.

19.    There was also work that we conducted on a more occasional basis but that we were not paid for. This included things like Nissan specific training within the nnanet.com system to ensure compliance with standards and to gain the ability to be paid on certain work. We would also have to attend or participate in meetings with the service department to discuss any issues, frequent warranty-work recalls/repairs, status of shops, etc. Further, we would have discussions with persons from Nissan (TSMs and DTSs) about directions and information on warranty work and customer paid work.

## FAIR LABOR STANDARDS ACT AND FLORIDA WAGE VIOLATIONS

20.    Throughout my formal employment at both Nissan dealerships named above, I was a non-exempt employee. All other technicians were also non-exempt employees to the best of my knowledge.

21.    At both dealerships, I was paid on a weekly basis.

22.    In my history working with Sutherlin Nissan and Reed Nissan Clermont, I generally worked 6 days per work week for 2 weeks out of every month. On the other 2 weeks of the month, I usually worked 5 days per week.

23.    During that time, I would typically work 12-hour shifts. Nearly every time, I would exceed a 40-hour work week. On average, I would estimate that I worked 50-70 hours per week. This was the same situation of most, and I believe all persons, working in the Nissan dealerships like myself.

24.    For work in 2015 through 2020, I am owed at least the following amounts in minimum wages, which totals $2,124.96 under the Florida Statute.

| 2015 | $156.96 |
|------|---------|
| 2016 | $392.40 |
| 2017 | $410.40 |
| 2018 | $464.40 |
| 2019 | $573.00 |
| 2020 | $127.80 |

25.    To give further example: on April 17, 2019, I received a paycheck stating that I worked 13 hours and was paid $416.00 (gross). However, in reality, I worked at least 60 hours, putting me approximately $.32 per hour below the federal minimum wage rate of $7.25 per hour for 2019. For this one week, I am owed approximately $19.20 in unpaid federal minimum wages. As to the Florida state minimum wage for that same pay period (FL State Minimum wage being $8.46), I would be owed a total of $91.80 for that work week (I was paid about $1.53 below the state minimum wage).

26.    When I had to make tool and equipment purchases, my wage would particularly drop below minimum wage, making it very difficult to make ends meet.

27.    Additionally, myself and other technicians (in both dealerships I worked at) were only compensated for what was called "flagged hours" at the "flat-rate" pay that Nissan corporate set up for dealerships to follow. We were not paid for anything that

was not a "flagged hour" under the "flat-rate" compensation program while working in the dealerships, resulting in unpaid wages to me and other employees.

28.    Moreover, generally, when myself and other employees would have to do trainings within the Nissan corporate's nnanet.com program, we would not be compensated for that training.

29.    This training was required by Nissan corporate to get paid on "warranty work" Nissan vehicles and certain other Nissan vehicles. We were also not compensated for time cleaning the shop, attending mandatory meetings, filling out and filing paperwork required of Nissan corporate for warranty work or customer paid work, or communicating with Nissan corporate in relation to gathering information when working on a warranty vehicle or a customer-paid vehicle, amongst other things.

30.    We were never paid any overtime wages for all the hours we worked, whether those hours were flagged, or non-flagged.

31.    We were certainly not paid any "unflagged hours" whatsoever—in other words, we were not compensated for all hours actually worked on behalf of Nissan.

32.    To provide an example of overtime issues: on January 31, 2020, I received a paycheck stating that I worked 48 hours and was paid $1,536.00 (gross). I was paid at my straight rate for each of these hours.

33.    However, I should have been paid at a rate not less than one and one-half times the regular rate for every hour more than (40) hours, but I was not. For this one week, I am owed a total of $384 in unpaid overtime wages.

34.     To an even worse degree, we were not compensated for the full time it took to work on most vehicles and were frequently docked in our hours if Nissan believed that we took "too long" on a vehicle.

35.     For example, although it can take a full day or more to work on a transmission for a Nissan Altima, we were never paid the actual time it took to complete work on that car. And, if a customer-paid Nissan Altima came in for the same transmission issue as a warranty-covered Nissan Altima, the warranty-covered Altima would pay substantially less for the same work.

36.     Further, I plainly was never paid my final wage and paycheck after completely resigning from Nissan dealerships.

**ADDITIONAL COMPENSATION AND UNJUST ENRICHMENT**

37.     To my understanding, generally, no one was reimbursed or compensated for the tools we purchased. I was required to purchase thousands of dollars' worth of tools every year (likely around $3000 per year) to complete the job I did in the dealerships, on behalf of Nissan. In all of my tenure as a Nissan technician, I was only ever offered a reimbursement of one tool during my time with Sutherlin Nissan, which I had to surrender upon my resignation.

38.     Tools were not provided to Nissan technicians to complete their day to day work on behalf of Nissan. We obviously needed tools to work on customer-paid vehicles and warranty-paid vehicles for Nissan corporate. Tools were required to complete the work to the standards demanded of Defendant Nissan and consistent with the procedures set forth in their various manuals. There were <u>extremely few</u>

Nissan special tools for discrete service work (these were not tools to complete the everyday work demanded by Nissan).

39.     Nissan corporate would of course benefit from the tools we purchased because we conducted work on Nissan's corporate warranty-covered vehicles (for example) and Nissan corporate could not meet its warranty obligations without the technicians performing the work with the tools the technicians had to purchase on their own (and were not compensated for).

40.     Further, as mentioned above, we provided Nissan corporate with benefits that were never captured within our pay. These are items such as the non-flagged hours described above, including but not limited to maintaining the shop on behalf of Nissan corporate (as required to meet Nissan corporate brand standards), filing and managing the paperwork that was required by Nissan corporate on warranty and other customer-paid work, taking and participating in training both on-site and off-site which are required to be paid on certain work and to continue working as a Nissan technician.

I declare under penalty of perjury that the foregoing is true and correct, executed as of December 30, 2021.

*/s/ Jose J. Ayala, Jr.*

JOSE J. AYALA, JR.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION



JOSE J. AYALA, JR., AND JEFF
SANTOS, ON BEHALF OF THEMSELVES
AND THOSE SIMILARLY SITUATED

      Plaintiffs,

v.                             **CLASS & COLLECTIVE ACTION**

                                 Case No.: 6:20-cv-01625-RBD-GJK

NISSAN NORTH AMERICA, INC.,

      Defendant.

_____/

### <u>PLAINTIFF'S (CLASS/COLLECTIVE REPRESENTATIVE), JOSE AYALA, AMENDED RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES[1]</u>

      Plaintiff, JOSE J. AYALA, JR., on behalf of himself and those similarly situated, by and through undersigned counsel, pursuant to Rule 34, responds to Defendant's, NISSAN NORTH AMERICA, INC., First Set of Interrogatories as follows:

1.     Identify all persons known to you who have any knowledge of the facts alleged in your Complaint and, for each such individual, identify the substance of each individual's knowledge, last known address, and phone number.

---

[1] Plaintiff reserves the right to supplement or amend these answers to Defendant's Interrogatories as discovery is ongoing.

**ANSWER**: Please see the initial disclosures my attorneys made on my behalf, which was served on Defendant on October 18, 2021 for this information. The foregoing notwithstanding, please see the summary below:

- Kevin K. Ross-Andino, (Counsel for Plaintiffs and class/collective action members)
  307 Cranes Roost Boulevard, Altamonte Springs, FL 32701
  407-636-7004

- Jolynn M. Falto, (Co-Counsel for Plaintiffs and class/collective action members)
  307 Cranes Roost Boulevard, Altamonte Springs, FL 32701
  407-636-7004

- Nikki J. Pappas, (Co-Counsel for Plaintiffs and class/collective action members)
  307 Cranes Roost Boulevard, Altamonte Springs, FL 32701
  407-636-7004

- Jeff Santos (co-class/collective action representative Plaintiff)
  Can be contacted through counsel of record identified above.

- Any and all class and collective action members during the class period described within the First Amended Complaint.
  Can be contacted through counsel of record identified above.

- Defendant Nissan North America, Inc. and their attorneys
  Can be contacted through defense counsel of record.

- Paul Rogers
  Can be contacted through defense counsel of record.

- Barbara Park
  Can be contacted through defense counsel of record.

2.    Identify each Nissan independent dealer that directly employed you as a mechanic or technician (or in a similar automobile maintenance and repair position) from September 1, 2015 to the present and, for each such entity, state the positions you held with each entity; the dates you held each position; and your supervisor(s) or manager(s) for each position.

**ANSWER:**
Sutherlin Nissan
8125 E Colonial Dr, Orlando FL 32817
John Snoke: Service Manager
Position: Automotive Technician. Please note, I also held the official title of Team Leader.
Approximate Time: 2011 - 2019

Reed Nissan Clermont
16005 State Rd. 50, Clermont FL 34711
Bob Suranovich[2]: Service Manager
Position: Service Technician
Approximate Time: November 2019 – March 2020

3.      For each position with each entity identified in your response to Interrogatory No. 2, describe your typical day-to-day tasks, including the number or percentage of work hours you spent performing each task.

**OBJECTION:** Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly burdensome as it appears to require Plaintiff to provide a line-item-accounting of the various tasks he performed on a daily basis, including the amount of work hours spent in performing each task during the class period, stemming from 2015 to present time. This interrogatory is best suited for deposition testimony as it tends to call for a narrative from Plaintiff over an extensive amount of time (2015 through the end of his employment with Nissan). The foregoing notwithstanding, please see below.

**ANSWER:** During my time at the previously mentioned Nissan dealerships as an automotive/service technician, I generally performed the following types of tasks on a day-to-day basis:

Technician/Vehicle Service Work: encompassed approximately 80% of a typical workday on average and included (but is not limited to) the following:
   o   Diagnosing repairs to the vehicles that came to the dealerships, which included both warranty-work under Nissan vehicle warranties and "customer-paid-work".

---

[2] Correct spelling of the last name is unknown at this time.

3

- o Perform the work required to maintain/repair the vehicles that came into the dealership which included both warranty-work under Nissan vehicle warranties and "customer-paid-work".
- o Conduct all maintenance and repair work in accordance with Nissan's requirements.
- o Assist other technicians with certain work and diagnostics on vehicles.

Administrative/Other Work: encompassed approximately 20% of a typical workday on average and included (but is not limited to) the following:
- o When I was team leader at Sutherlin Nissan, I would have to assist in the distribution of work to other technicians within my "team". The work consisted of both "warranty-work" and "customer-paid-work".
- o Review of bulletins and other manuals/policies/similar associated with warranty-work vehicles and customer-paid vehicles to ensure compliance with Nissan's standards. Conduct any administrative /compliance work to make sure I followed Nissan's directions for repair/maintenance of vehicles.
- o Documenting and providing information required to Nissan on warranty-work vehicles.
- o Communicating with customers and/or service writers on vehicles and/or vehicle repairs.
- o Organizing and cleaning the shop to maintain Nissan's brand standards.
- o Organize and clean workspace(s) to maintain Nissan's brand standards and expectations.
- o Assist with other warranty-work issues to ensure compliance with Nissan's standards and to promptly deliver the vehicle to the customer in a reasonable time.

Other Work (not necessarily on a daily basis, but was frequent):
- o Participate in Nissan-specific training within the NNAnet.com website to ensure compliance with standards and to gain the ability to be paid on certain warranty-work.
- o Attend/participate in meetings with technician/service department to discuss any issues, frequent warranty-work recalls/repairs, status of shop, etc.
- o Discussions with persons from Nissan (TSM and DTS) regarding certain directions for warranty work and customer-paid work.

4.     For each identified in your response to Interrogatory No.2, describe the circumstances of your hiring with such entity, including the individual(s) to whom you submitted your application(s), the individual(s) with whom you interviewed for the job, the individual(s) who decided to hire you, and the individual(s) who communicated the decision to hire you.

**ANSWER:**

**Sutherlin Nissan**: 2011-2019
I believe I was interviewed by Dave Dalton. Hiring Manager at the time was Ray Powers. At that time, I was to be paid $20 per flat rate hour (in comparison, the flat rate amounts per task are decided by Nissan North American) when with Sutherlin Nissan. All other raises were given by John Snoke.

**Reed Nissan Clermont**: November 2019 through March 2020.
I believe I was interviewed by Bob Suranovich. I believe he submitted my hourly pay rate (in comparison, the flat rate amounts per task are decided by Nissan North American). Supervisor Keith Mantel dispatched work and communicated with me as well.

5.     For each entity identified in your response to Interrogatory No.2, describe the circumstances of the cessation of your employment with such entity, including whether you resigned or were terminated and, if you were terminated, the reason for the termination, the individual(s) who made the decision to terminate your employment, and the individual(s) who communicated the termination decision to you.

**ANSWER:** I resigned from both Sutherlin Nissan and Reed Nissan Clermont for various reasons which culminated over time, including false promises, not making sufficient hours, arbitrary and unfair deductions in pay for work I completed (especially with Nissan warranty-work), not being fairly compensated for the work I completed as a technician, and lack of work resources/tools (which I had to purchase on my own, from my own funds/resources). I did not feel that the technicians were treated and compensated fairly for all the work and hours they put in; this caused a lot of friction within the workplace and with morale.

6.     For each position with each entity identified in your response to Interrogatory No.2, identify the individual(s) who supervised or directed your day-to-day work

activities, including not limited to, the individual(s) who set your schedule, the individual(s) who provided you with work assignments and tasks, the individual(s) who conducted performance reviews, the individual(s) who disciplined you, and the individual(s) who determined your compensation and any changes to that compensation and, for each individual, describe such individual's supervision or direction of you day-to-day work.

> **ANSWER:** While working at Sutherlin Nissan, the Service Manager was John Snoke; however, I was not "traditionally" supervised over my day-to-day work itself by John Snoke. Work was channeled through to technicians from service writers that would administer the vehicles that came to the dealership for service; work was not generally specifically "assigned" because we would take the next vehicle ticket that was on a rack from the service writers (the service writers would essentially "intake" the cars). No one conducted performance reviews at all, to my knowledge. Disciplinary issues were rare, but I believe John Snoke was the person who would provide warnings/issue any disciplines. John Snoke assigned the hourly pay rate. Defendant Nissan North America (who we called "Corporate") would dictate how many hours/parts-of-an-hour the specific task I conducted would pay. For example, if a warranty-paid transmission was the task to be completed, the Defendant decided that it would pay four hours for that work (for example), no matter if it took me substantially longer than four hours. Therefore, my take-home pay—the hours that I "turned"—were dictated by Defendant. We are paid the flat rates set by Nissan for the work we "turned". Nissan set the requirements for how we were to be paid on flat rate amounts per job for warranty repair work. Direction for the work conducted, especially for warranty-work, was provided by Defendant through their various manuals, policies, bulletins, the NNAnet.com programs, and the Nissan Assist Program. Further, the Products Resource Manual provided a substantial amount of direction imposed on the technicians and, in part, how technicians were to be paid in their flat rate work.

> Virtually everything was identical between Sutherlin Nissan and Reed Nissan with a few changes. For example, while at Reed Nissan in Clermont, my manager was Bob Suranovich and the Shop Foreman/Supervisor was Keith Mantel. Keith Mantel dispatched the work to the technicians.

7.     Identify every tool, piece of equipment, or supply your purchased without reimbursement from September 1, 2015 to the present which you claim you were required to purchase to perform your work as a technician/mechanic and, for each

tool, piece of equipment, or supply, provide the date of the purchase and the amount you paid for it.

> **ANSWER:** On average, I likely spent above $3,000 per year on tools and work materials from Snap-on, Matco and Cornwell (and likely other brands of tools/equipment as well). I will provide the documents I have in my possession showing the tools I purchased and used during my time with Nissan, which were required for my work.

8.     Identify each communication that you had with a Nissan employee (not an employee of the independent dealer which directly employed you) from September 1, 2015 to the present, including the person(s) with whom you communicated, the date of communication, the manner of communication (e.g., verbal, letter, e-mail), and the substance of the communication.

> **ANSWER:** While I cannot remember the specific dates, I spoke with various TSM and DTS personnel from Nissan during my time as a technician. Additionally, over my several years working as a technician, I had various communications over the phone with unknown persons at Nissan regarding warranty vehicles and service issues with vehicles to receive direction.

9.     Identify each Nissan employee (not an employee of the independent dealer which directly employed you) whom you claim supervised or directed your work and, for each such individual, describe the nature and extent of his or her supervision or direction of your work.

> **ANSWER:** Various TSM and DTS personnel from Nissan during my time as a technician assisted and provided direction. Additionally, over my several years working as a technician, I had various communications over the phone with unknown persons at Nissan regarding warranty vehicles and service issues with vehicles to receive direction.

> Most importantly, Defendant Nissan controlled (via their specific manuals, policies, bulletins, and other documents) how technicians would conduct their work—we were required to perform all repairs (warranty-work especially, but also with customer-paid work to ensure consistency) according to Nissan's various manuals. Ultimately, we were required to work, act, clean, and stay organized in the manner consistent with and complying with Nissan's many policies and procedures.

10.     Describe in detail each way in which you contend you were injured or have suffered damages, including, but not limited to,

    a)  stating the total amount of damages claimed and a computation of each category of damages you claim;
    b)  itemizing the amount of each element of damages claimed;
    c)  stating all facts or grounds upon which you rely to support each element of damages claimed;
    d)  stating the methods, theories and calculations by which you arrived at the claimed dollar amounts of each element of damages claimed;
    e)  identifying any person whom you know or whom you believe has knowledge of the basis for and calculation of such damages; and
    f)  identifying the person(s) who calculated the amount of each element damages.

**ANSWER:** I am not a legal expert, so I defer to my attorneys and future expert(s) to describe my damages; however, I am owed various wages and other monetary compensation from Nissan for work that I performed for Nissan over the years. I was not provided a minimum wage for a portion of my damages, and I was not compensated for other work performed that is not part of the "flat rate" issue (i.e. unflagged hours). There are also hours that I should have been paid that are outside the FLSA/FMWA realm which I was just plainly not compensated for. I also understand that there are benefits that I provided Nissan that I was not compensated for, such as cleaning the shops, doing required Nissan trainings, buying and using tools to conduct the work, and keeping shops organized in compliance with Nissan's requirements. I will produce paystubs, receipts, and other documents responsive to this interrogatory to help substantiate my claims and damages. Further, I defer to the future expert(s) that will disclose expert report(s) on my behalf.

11.     Describe in detail every criminal offense (other than minor traffic citations constituting a misdemeanor) of which you been convicted, if any, during the seven-year period prior to the commencement of this lawsuit, regardless of the magnitude of the offense, and specify the dates and jurisdiction of the conviction, the offense(s) of which you were convicted, and any sentence imposed against you. Identify the time period which you were on probation or otherwise under court supervision.

**ANSWER:** None currently known.

12.    Identify all expert witnesses whom you expect to testify at trial of this matter and, for each, state the subject matter on which they are expected to testify, the facts and opinions to which they are expected to testify, and a summary of the grounds for each opinion they expect to express.

    **ANSWER:** As discovery remains underway, my attorneys have not finished evaluating what expert(s) would be presented for this case; however, I understand we will disclose expert(s) report(s) by the Court's deadline of February 14, 2022.

## **VERIFICATION PAGE**

I have read the foregoing Answers to Interrogatories and do swear that they are true and correct of

the best of my knowledge and belief.

_José Ayala_
Signature

_José Ayala_
Printed Name

STATE OF Florida
COUNTY OF Seminole

Sworn to or affirmed and signed before me on November, 30th, 2021, by JOSE J. AYALA.

_Drew Fulmer_
NOTARY PUBLIC or DEPUTY CLERK

Drew Matthew Fulmer
[Print, type or stamp commission name of notary of deputy clerk]

___ Personally Known

_X_ Produced Identification

Type of Identification produced: Florida DL

DREW MATTHEW FULMER
Notary Public · State of Florida
Commission # GG 351825
My Comm. Expires Jul 4, 2023
Bonded through National Notary Assn.

# DE 67-2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

# Ex. 1.2

JOSE J. AYALA, JR. and JEFF SANTOS, on behalf of themselves and as representatives of other class members similarly situated,

      Plaintiffs,

v.

                                    Case No.: 6:20-cv-01625-RBD-GJK

NISSAN NORTH AMERICA, INC. D/B/A NISSAN USA, a California corporation, a wholly owned subsidiary of Nissan Motor Company of Japan,

      Defendant.

_____/

## DECLARATION OF JEFF SANTOS

I, Jeff Santos declare, based upon personal knowledge and under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

**EMPLOYMENT HISTORY/ FACTS TOWARDS JOINT EMPLOYER / OTHERS WHO EXPERIENCED SIMILAR ISSUES**

1.    I was formally employed by Sutherlin Nissan in Orlando, Florida from approximately 2014-2016 and again from 2019-2020. That dealership is located at 8125 E. Colonial Dr., Orlando, FL 32817. I was employed as an Automotive Technician and paid as a nonexempt employee to which I expected to make my hourly rate.

1

2.      I was formally employed by Universal Nissan in Orlando, Florida from approximately 2016-2017. That dealership is located at 12785 S Orange Blossom Trial, Orlando, FL 32837. I was employed as an Automotive Technician and paid as a nonexempt employee to which I expected to make my hourly rate.

3.      I was employed by Reed Nissan of Orlando in 2018. The dealership was located at 3776 W Colonial Dr, Orlando, FL 32808. I was employed as an Automotive Technician and paid as a nonexempt employee to which I expected to make my hourly rate.

4.      While at all three dealerships identified above, I was a Nissan certified technician that was employed and required to conduct warranty work on Nissan manufactured vehicles, which required that I submit Nissan required paperwork to my dealership and Nissan corporate for payment and approval.

5.      To be more specific, it was common knowledge at all dealerships that in order for any technician to be paid for the work that she or he performed, the technician had to follow all of the processes and procedures required by Nissan corporate (and not the dealership) in terms of how work was performed, the time requirements for performing the work, the documents that must be submitted to corporate through the electronic submission process established and controlled by corporate, among other things. Everyone knew that corporate controlled this process and that if we did not comply with corporate's processes and requirements, this would affect our compensation, among other issues that it could create for both the dealership and the employee.

6.     Employees were always made aware of the fact, and lead to believe, that the compensations process for warranty and other work was dictated by Nissan corporate and not the dealership, which was apparent based on the process that we had to follow in order for both the dealership, and ultimately the employee, to be compensated.

7.     While working at all three dealerships identified above, I was required to conduct all maintenance and repair work in accordance and in strict compliance with Nissan corporate's requirements, both for warranty-work Nissan vehicles and customer-paid vehicles.

8.     I was required as a condition of my employment to access various resources from Nissan corporate to ensure that the work I performed as an employee of Nissan for both customer-paid work and warranty-work met Nissan corporate's standards (and not necessarily by any particular standards required by the dealership itself).

9.     I was required as a condition of my employment to access Nissan corporate's systems such as nnanet.com (Nissan corporate's website/database with bulletins, repair work information and processes, and training/certification information), the *Assurance Products Resource Manual* from Nissan corporate, physical bulletins, and attend meetings to ensure our work was compliant with standards and procedures set by Nissan corporate.   Every dealership I worked with made it clear that in order to maintain my employment and receive compensation, I (along with every other employee in my department) had to comply with all Nissan corporate's requirements, processes, policies, and so forth, and we were required to use Nissan corporate systems

3

and resources to perform our job and maintain our status as certified Nissan technicians – the certification came from corporate and not the local dealership.

10.    We were advised that all work had to be compliant with Nissan corporate's standards and procedures for us to be paid on the work that was conducted; the individual dealerships did not really have any processes, procedures, etc. that were different from those of Nissan corporate.  In fact, I believe it is fair to say that all process, procedures, and requirements to perform my job duties were, irrespective of what dealership I worked at, established, and mandated by Nissan corporate and policed by corporate.   All other technicians and service personnel were required to do the same.

11.    I also refer to and incorporate my verified responses to Defendant Nissan's interrogatories for additional information about the work that I conducted on behalf of Defendant Nissan, for their benefit. *See Exhibit A*.

12.    I am well aware of what several other Nissan technicians/maintenance/service personnel made in their wages, the hours they worked, the compensation, and the systematic behavior of Nissan corporate because I worked and discussed these issues with several others over my lengthy employment with Nissan since 2014. We were all frustrated by the deficiencies in the compensation we received and the lack of authority our dealerships had to address and resolve these issues.

13.    The issues we now raise in this lawsuit were the center of discussion on a near weekly basis when we received our paychecks and pay stubs – it was clear to us all that we were rarely compensated for all of the hours we worked, that we rarely received

compensation commensurate with our hourly pay rate, and that almost never received compensation for overtime, among other issues and concerns that all of us felt.

14.    I worked at three different Nissan dealerships and the issues were nearly identical and over a large span of time, the same is true of every other Nissan employee, including employees that worked at different dealerships.

15.    While I no longer work with any Nissan dealership, I am still in the automotive service industry and recognize a difference in appropriate compensations programs in the automotive service industries in comparison to the three Nissan dealerships I worked at over an extensive period.

16.    It is also relatively simply to calculate wages owed to me and other people because Nissan established and provides to dealerships and technicians the amount it will pay per job at its "flat rate" for work on the vehicles.

17.    Further, from my experience at the dealerships, Nissan corporate and the dealerships are in frequent conversations about warranty work, what will be paid or not be paid on vehicles, new procedures, recalls, bulletins, training, maintenance issues, and more.

18.    Additionally, I understand that our attorneys will hire experts who will perform simple calculations on a mass scale to determine damages to all personnel in this matter.

**JOB DUTIES ON BEHALF OF NISSAN**

19.    During my time as an automotive/service technician, I typically did these tasks daily:

5

a. Diagnosing repairs to the vehicles that came to the dealerships, which included both warranty-work under Nissan vehicle warranties/service agreements and "customer-paid-work". Unfortunately, not all of my work in diagnosing vehicles was paid either in part or in full.

b. Perform the work required to maintain/repair the vehicles that came into the dealership which included both warranty-work under Nissan vehicle warranties and "customer-paid-work".

c. Conduct all maintenance and repair work in accordance with Nissan's requirements.

d. Assist other technicians with certain work and diagnostics on vehicles. Helping others is considered an "unflagged" hour and we would not generally get paid to help another teammate, even when the repair/service on the vehicle required it.

e. Review of bulletins and other manuals/policies/or similar associated with warranty-work vehicles and customer-paid vehicles to ensure compliance with Nissan's standards. Conduct any administrative /compliance work to make sure I followed Nissan's directions for repair/maintenance of vehicles. Again, these requirements are "unflagged hours", but were necessary to complete the job—we were not paid for it.

f. Documenting and providing information required to Nissan on warranty-work vehicles. Likewise, we were not paid to provide the required information to Nissan on warranty-work vehicles.

g. Communicating with customers and/or service writers on vehicles and/or vehicle repairs. Even if we communicated with customers or the service writers to assist the customer/vehicle, we were not compensated this time.

h. Organizing and cleaning the shop to maintain Nissan's brand standards. We were never paid to do this.

i. Organize and clean workspace(s) to maintain Nissan's brand standards and expectations. This was likewise considered unpaid, unflagged hours.

j.   Assist with other warranty-work issues to ensure compliance with Nissan's standards and to promptly deliver the vehicle to the customer in a reasonable time. If there was any additional work that needed to be done on a vehicle to ensure it made it to the customer on time, we were not paid the extra time we put into the vehicle.

20.    There was also work that we conducted on a more occasional basis but that we were not paid for.

21.    This included things like Nissan specific training within the nnanet.com system to ensure compliance with standards and to gain the ability to be paid on certain work. We would also have to attend or participate in meetings with the service department to discuss any issues, frequent warranty-work recalls/repairs, status of shops, etc.

22.    Further, we would have discussions with persons from Nissan (TSMs and DTSs) about directions and information on warranty work and customer paid work.

**FAIR LABOR STANDARDS ACT AND FLORIDA WAGE VIOLATIONS**

23.    Throughout my formal employment at the three Nissan dealerships named above, I was a non-exempt employee. All other technicians/maintenance/service personnel were also non-exempt employees to the best of my knowledge.

24.    At all three dealerships, I was paid on a weekly basis.

25.    In my history working with Sutherlin Nissan, Universal Nissan, and Reed Nissan Orlando, I generally worked 6 days per work week for 2 weeks out of every month. On the other 2 weeks of the month, I usually worked 5 days per week.

26.    During that time, I would typically work 12-hour shifts. Nearly every time, I would exceed a 40-hour work week. On average, I would estimate that I worked 50-

60 hours per week. This was the same situation or similar situation of most, and I believe all persons, working in the Nissan dealerships like myself.

27.     For work in 2016 through 2020, I am owed at least the following amounts in minimum wages, which totals $9,975.84 under the Florida Statute.

| 2016 | $1,617.84 |
|------|-----------|
| 2017 | $2,016.00 |
| 2018 | $2,286.00 |
| 2019 | $2,561.28 |
| 2020 | $1,494.72 |

28.     To give further example: on February 9, 2018, I received a paycheck stating that I worked 19.3 hours and was paid $328.10 (gross). However, in reality, I worked at least 50 hours, putting me approximately $.69 per hour below the federal minimum wage rate of $7.25 per hour for 2018.

29.     For this one week, I am owed approximately $34.50 in unpaid federal minimum wages. As to the Florida state minimum wage for that same pay period (FL State Minimum wage being $8.25 per hour in 2018), I would be owed a total of $84.50 for that work week (I was paid about $1.69 below the state minimum wage).

30.     When I had to make tool and equipment purchases, my wage would particularly drop below minimum wage, making it very difficult to make ends meet.

31.     Additionally, myself and other technicians (in all dealerships I worked at) were only compensated for what was called "flagged hours" at the "flat-rate" pay that Nissan corporate set up for dealerships to follow. We were not paid for anything that was not a "flagged hour" under the "flat-rate" compensation program while working in the dealerships, resulting in unpaid wages to me and other employees.

8

32.     Moreover, generally, when myself and other employees would have to do trainings within the Nissan corporate's nnanet.com program, we would not be compensated for that training.

33.     This training was required by Nissan corporate to get paid on "warranty work" Nissan vehicles and certain other Nissan vehicles. We were also not compensated for time cleaning the shop, attending mandatory meetings, filling out and filing paperwork required of Nissan corporate for warranty work or customer paid work, or communicating with Nissan corporate in relation to gathering information when working on a warranty vehicle or a customer-paid vehicle, amongst other things.

34.     We were never paid any overtime wages for all the hours we worked, whether those hours were flagged, or non-flagged.

35.     We were certainly not paid any "unflagged hours" whatsoever—in other words, we were not compensated for all hours actually worked on behalf of Nissan.

36.     To provide an example of overtime issues: on January 4, 2019, I received a paycheck stating that I worked 46.7 hours and was paid $863.95 (gross). I was paid at my straight rate for each of these hours.

37.     However, I should have been paid at a rate not less than one and one-half times the regular rate for every hour more than forty (40) hours, but I was not. For this one week, I am owed a total of $185.93 in unpaid overtime wages.

38.     To an even worse degree, we were not compensated for the full time it took to work on most vehicles and were frequently docked in our hours if Nissan corporate believed that we took "too long" on a vehicle.

39.    For example, although it can take a full day or more to work on a transmission for a Nissan Altima, we were never paid the actual time it took to complete work on that car. And, if a customer-paid Nissan Altima came in for the same transmission issue as a warranty-covered Nissan Altima, the warranty-covered Altima would pay substantially less for the same work.

**ADDITIONAL COMPENSATION AND UNJUST ENRICHMENT**

40.    I was required to purchase thousands of dollars' worth of tools during my time working as a Nissan technician to complete the job I did in the dealerships, on behalf of Nissan.

41.    To my understanding, no one was reimbursed or compensated for the tools we purchased. I estimate that I spent at least $12,000.00 in tools during my time as a Nissan technician, and in fact, I am still paying off those tools although I no longer work with a Nissan dealership.

42.    Tools were not provided to Nissan technicians to complete their day to day work on behalf of Nissan. We obviously needed tools to work on customer-paid vehicles and warranty-paid vehicles for Nissan. Tools were required to complete the work to the standards demanded of Nissan corporate and consistent with the procedures set forth in their various manuals. There were <u>extremely</u> <u>few</u> Nissan special tools for discrete service work (these were not tools to complete the everyday work demanded by Nissan).

43.    Nissan corporate would of course benefit from the tools we purchased because we conducted work on Nissan corporate's warranty-covered vehicles (for example)

and Nissan corporate could not meet its warranty obligations without the technicians performing the work with the tools the technicians had to purchase on their own (and were not compensated for).

44.     Further, as mentioned above, we provided Nissan corporate with benefits that were never captured within our pay. These are items such as the non-flagged hours described above, including but not limited to maintaining the shop on behalf of Nissan corporate (as required in the manuals), filing and managing the paperwork that was required by Nissan corporate on warranty and other customer-paid work, taking and participating in training both on-site and off-site which are required to be paid on certain work and to continue working as a Nissan technician.

I declare under penalty of perjury that the foregoing is true and correct, executed as of December 30, 2021.

*/s/ Jeff Santos*

JEFF SANTOS

UNITED STATES DISTRICT COURT 
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOSE J. AYALA, JR., AND JEFF
SANTOS, ON BEHALF OF THEMSELVES
AND THOSE SIMILARLY SITUATED

     Plaintiffs,

v.                              **CLASS & COLLECTIVE ACTION**

                                   Case No.: 6:20-cv-01625-RBD-GJK

NISSAN NORTH AMERICA, INC.,

     Defendant.

_____/

## PLAINTIFF'S (CLASS/COLLECTIVE REPRESENTATIVE), JEFF SANTOS, RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES[1]

     Plaintiff, JEFF SANTOS, on behalf of himself and those similarly situated, by and through undersigned counsel, pursuant to Rule 34, responds to Defendant's, NISSAN NORTH AMERICA, INC., Interrogatories as follows:

1.     Identify all persons known to you who have any knowledge of the facts alleged in your Complaint and, for each such individual, identify the substance of each individual's last known address and phone number.

     **ANSWER:** Please see the initial disclosures my attorneys made on my behalf, which was served on Defendant on October 18, 2021 for this information. The foregoing notwithstanding, please see the summary below:

---
[1] Plaintiff reserves the right to supplement or amend these answers to Defendant's Interrogatories as discovery is ongoing.

- Kevin K. Ross-Andino, (Counsel for Plaintiffs and class/collective action members)
  307 Cranes Roost Boulevard, Altamonte Springs, FL 32701
  407-636-7004

- Jolynn M. Falto, (Co-Counsel for Plaintiffs and class/collective action members)
  307 Cranes Roost Boulevard, Altamonte Springs, FL 32701
  407-636-7004

- Nikki J. Pappas, (Co-Counsel for Plaintiffs and class/collective action members)
  307 Cranes Roost Boulevard, Altamonte Springs, FL 32701
  407-636-7004

- Jeff Santos (co-class/collective action representative Plaintiff)
  Can be contacted through counsel of record identified above.

- Any and all class and collective action members during the class period described within the First Amended Complaint.
  Can be contacted through counsel of record identified above.

- Defendant Nissan North America, Inc. and their attorneys
  Can be contacted through defense counsel of record.

- Paul Rogers
  Can be contacted through defense counsel of record.

- Barbara Park
  Can be contacted through defense counsel of record.

2.    Identify each Nissan independent dealer that directly employed you as a mechanic or technician (or in a similar automobile maintenance and repair position) from September 1, 2015 to the present and, for each such entity, state the positions you held with each entity; the dates you held each position; and your supervisor(s) or manager(s) for each position.

**ANSWER:**[2]
Sutherlin Nissan (approximately 2014 through 2016, 2019-2020)
8125 E Colonial Dr, Orlando, FL 32817
John Snoke: Service Manager
Position: Automotive Technician.

Universal Nissan (approximately 2016 through 2017)
12785 S Orange Blossom Trial, Orlando, FL 32837
Position: Automotive Technician.
Tony Figueroa: Service Manager[3]

Reed Nissan Orlando (approximately 2018)
3776 W Colonial Dr, Orlando, FL 32808
Position: Automotive Technician.
Joey Colon[4]: Service Manager

3.     For each position with each entity identified in your response to Interrogatory
No.2, describe your typical day-to-day tasks, including the number or percentage of
work hours you spent performing each task.

> **OBJECTION:** Plaintiff objects to this interrogatory on the grounds that it is
> overly broad and unduly burdensome as it appears to require Plaintiff to provide
> a line-item-accounting of the various tasks he performed on a daily basis,
> including the amount of work hours spent in performing each task during the
> class period, stemming from 2015 to present time. This interrogatory is best
> suited for deposition testimony as it tends to call for a narrative from Plaintiff
> over an extensive amount of time (2015 through the end of his employment with
> Nissan). The foregoing notwithstanding, please see below.

> **ANSWER:** During my time at the previously mentioned Nissan dealerships as
> an automotive/service technician, I generally performed the following types of
> tasks on a day-to-day basis:

---

[2] I am providing estimated/approximate dates within this interrogatory, from my memory. I will
update this if necessary.
[3] I believe there was another service manager during my time at Universal Nissan, however I do not
currently recall his name.
[4] The correct spelling/correct last name currently unknown. I believe there were other service
managers at this location as well, however I do not currently recall their complete names/identities.

<u>Technician/Vehicle Service Work</u>: encompassed approximately 80% of a typical workday on average and included (but is not limited to) the following:

- o Diagnosing repairs to the vehicles that came to the dealerships, which included both warranty-work under Nissan vehicle warranties and "customer-paid-work".
- o Perform the work required to maintain/repair the vehicles that came into the dealership which included both warranty-work under Nissan vehicle warranties and "customer-paid-work".
- o Conduct all maintenance and repair work in accordance with Nissan's requirements.
- o Assist other technicians with certain work and diagnostics on vehicles.

<u>Administrative/Other Work</u>: encompassed approximately 20% of a typical workday on average and included (but is not limited to) the following:

- o Review of bulletins and other manuals/policies/similar associated with warranty-work vehicles and customer-paid vehicles to ensure compliance with Nissan's standards. Conduct any administrative /compliance work to make sure I followed Nissan's directions for repair/maintenance of vehicles.
- o Documenting and providing information required to Nissan on warranty-work vehicles.
- o Communicating with customers and/or service writers on vehicles and/or vehicle repairs.
- o Organizing and cleaning the shop to maintain Nissan's brand standards.
- o Organize and clean workspace(s) to maintain Nissan's brand standards and expectations.
- o Assist with other warranty-work issues to ensure compliance with Nissan's standards and to promptly deliver the vehicle to the customer in a reasonable time.

<u>Other Work (not necessarily on a daily basis, but was frequent)</u>:

- o Participate in Nissan-specific training within the NNAnet.com website to ensure compliance with standards and to gain the ability to be paid on certain warranty-work.
- o Attend/participate in meetings with technician/service department to discuss any issues, frequent warranty-work recalls/repairs, status of shop, etc.

    o   Discussions with persons from Nissan (ATS and DTS) regarding certain directions for warranty work and customer-paid work.

4.     For each identified in your response to Interrogatory No.2, describe the circumstances of your hiring with such entity, including the individual(s) to whom you submitted your application(s), the individual(s) with whom you interviewed for the job, the individual(s) who decided to hire you, and the individual(s) who communicated the decision to hire you.

**ANSWER**:[5]

**Sutherlin Nissan**:

I believe I was interviewed by Paul (last name currently unknown and/or John Snoke). The Service Manager was John Snoke. I believe the Service Manager submitted my hourly pay rate (in comparison, the flat rate amounts per task are decided by Nissan North American) when with Sutherlin Nissan.

**Universal Nissan:**

I believe I may have been interviewed by Toney Figueora. I believe the Service Manager was Henry Machine and he likely submitted my hourly pay rate (in comparison, the flat rate amounts per task are decided by Nissan North American) when with Sutherlin Nissan.

**Reed Nissan Orlando**:

I believe I was interviewed by Joey Colon (shop foreman). I believe Guy M. (last name currently unknown) was the service manager. I believe he submitted my hourly pay rate (in comparison, the flat rate amounts per task are decided by Nissan North American).

5.     For each entity identified in your response to Interrogatory No.2, describe the circumstances of the cessation of your employment with such entity, including whether you resigned or were terminated and, if you were terminated, the reason for the termination, the individual(s) who made the decision to terminate your

---

[5] I am providing estimated/approximate dates and identities of persons within this interrogatory, from my memory. I will update this if necessary.

employment, and the individual(s) who communicated the termination decision to you.

      **ANSWER:** I resigned from the Nissan dealerships I listed for various reasons which culminated over time, including false promises, not making sufficient hours, arbitrary and unfair deductions in pay for work I completed (especially with Nissan warranty-work), not being fairly compensated for the work I completed as a technician, and lack of work resources/tools (which I had to purchase on my own, from my own funds/resources). I did not feel that the technicians were treated and compensated fairly for all the work and hours they put in; this caused a lot of friction within the workplace and with morale. I would leave and sometimes re-join those Nissan dealerships based on new promises for compensation and "better" work environments.

6.    For each position with each entity identified in your response to Interrogatory No.2, identify the individual(s) who supervised or directed your day-to-day work activities, including not limited to, the individual(s) who set your schedule, the individual(s) who provided you with work assignments and tasks, the individual(s) who conducted performance reviews, the individual(s) who disciplined you, and the individual(s) who determined your compensation and any changes to that compensation and, for each individual, describe such individual's supervision or direction of you day-to-day work.

      **ANSWER**: While working at Sutherlin Nissan, the Service Manager was John Snoke; however, I was not "traditionally" supervised over my day-to-day work itself by John Snoke. Work was channeled through to technicians from service writers that would administer the vehicles that came to the dealership for service; work was not generally specifically "assigned" because we would take the next vehicle ticket that was on a rack from the service writers (the service writers would essentially "intake" the cars). "Team Leaders" would also help with dispatching work. No one conducted performance reviews at all, to my knowledge. Disciplinary issues were rare, but I believe John Snoke was the person who would provide warnings/issue any disciplines. John Snoke assigned the hourly pay rate. Defendant Nissan North America (who we called "Corporate") would dictate how many hours/parts-of-an-hour the specific task I conducted would pay. For example, if a warranty-paid transmission was the task to be completed, the Defendant decided that it would pay four hours for that work (for example), no matter if it took me substantially longer than four hours. Therefore, my take-home pay—the hours that I "turned"—were dictated by Defendant. We are paid the flat rates set by Nissan for the work we "turned".

Nissan set the requirements for how we were to be paid on flat rate work. Direction for the work conducted, especially for warranty-work, was provided by Defendant through their various manuals, policies, bulletins, the NNAnet.com programs, and the Nissan Assist Program. Further, the Products Resource Manual provided a substantial amount of direction imposed on the technicians and, in part, how technicians were to be paid in their flat rate work.

Virtually everything was identical between each of the Nissan dealerships I worked at with a few changes. For example, the Service Managers/team leaders/service writers would change, but the overall day-to-day work and the overall structure were the same.

7. Identify every tool, piece of equipment, or supply your purchased without reimbursement from September 1, 2015 to the present which you claim you were required to purchase to perform your work as a technician/mechanic and, for each tool, piece of equipment, or supply, provide the date of the purchase and the amount you paid for it.

**ANSWER:** I will provide documents I have in my possession showing the tools I purchased and used during my time with Nissan, which were required for my work. Below is a sampling of the types of tools I had to purchase for my work (a non-exclusive list):

- 12 pc 1/4" Drive 6-Point Metric Flank Drive® Deep Socket Set (5-15 mm) (1) (112STMMY)

- 7 pc 3/8" Drive Metric Hex Bit Standard Socket Set (4-10 mm) (1) (207EFAMY)

- 12 pc 3/8" Drive 6-Point Metric Flank Drive® Shallow Socket Set (8-19 mm) (1) (212FSMY)

- 17 pc 1/2" Drive 6-Point Metric General Service Socket Set (1) (317AMMPC)

- 1/2" Drive TechAngle® Flex-Head Torque Wrench (12.5-250 ft-lb) (1) (ATECH3FR250B)

- 12" Flank Drive® Plus Adjustable Wrench (1) (FADH12B)

- 3/8" Drive 11" Knurled Friction Ball Extension (1) (FXK11)

7

- Curved Jaw with Cutter Locking Pliers (1) (LP10WR)

- 4 pc Pliers/Cutters Set (Red) (1) (PL400B)

- Convertible Retaining Ring Pliers (Blue-Point®) (1) (PRH57A)

- 3/8" Drive 6-Point SAE 13/16" Flank Drive® Shallow Spark Plug Socket (1) (S9704KA)

8.    Identify each communication that you had with a Nissan employee (not an employee of the independent dealer which directly employed you) from September 1, 2015 to the present, including the person(s) with whom you communicated, the date of communication, the manner of communication (e.g., verbal, letter, e-mail), and the substance of the communication.

  **ANSWER:** While I cannot remember the specific dates, I spoke with various ATS and DTS personnel from Nissan during my time as a technician. Additionally, over my several years working as a technician, I had various communications over the phone with unknown persons at Nissan regarding warranty vehicles and service issues with vehicles to receive direction. I believe I also spoke with Kevin Burket (spelling unknown) who was an engineer with Nissan, however, I cannot recall on what specific dates—we discussed schooling that Nissan provides and vehicle maintenance/repairs(s).

9.    Identify each Nissan employee (not an employee of the independent dealer which directly employed you) whom you claim supervised or directed your work and, for each such individual, describe the nature and extent of his or her supervision or direction of your work.

  **ANSWER**: Various ATS and DTS personnel from Nissan during my time as a technician assisted and provided direction to my work. Additionally, over my several years working as a technician, I had various communications over the phone with unknown persons at Nissan regarding warranty vehicles and service issues with vehicles to receive direction.

  Most importantly, Defendant Nissan controlled (via their specific manuals, policies, bulletins, and other documents) how technicians would conduct their work—we were required to perform all repairs (warranty-work especially, but also with customer-paid work to ensure consistency) according to Nissan's

8

various manuals. Ultimately, we were required to work, act, clean, and stay organized in the manner consistent with and complying with Nissan's many policies and procedures

10.    Describe in detail each way in which you contend you were injured or have suffered damages, including, but not limited to,

    a)  stating the total amount of damages claimed and a computation of each category of damages you claim;

    b)  itemizing the amount of each element of damages claimed;

    c)  stating all facts or grounds upon which you rely to support each element of damages claimed;

    d)  stating the methods, theories and calculations by which you arrived at the claimed dollar amounts of each element of damages claimed;

    e)  identifying any person whom you know or whom you believe has knowledge of the basis for and calculation of such damages; and

    f)  identifying the person(s) who calculated the amount of each element damages.

**ANSWER:** I am not a legal expert, so I defer to my attorneys and future expert(s) to describe my damages; however, I am owed various wages and other monetary compensation from Nissan for work that I performed for Nissan over the years. I was not provided a minimum wage for a portion of my damages, and I was not compensated for other work performed that is not part of the "flat rate" issue (i.e. unflagged hours). There are also hours that I should have been paid that are outside the FLSA/FMWA realm which I was just plainly not compensated for. I also understand that there are benefits that I provided Nissan that I was not compensated for, such as cleaning the shops, doing required Nissan trainings, buying and using tools to conduct the work, and keeping shops organized in compliance with Nissan's requirements. I will produce paystubs, receipts, and other documents responsive to this interrogatory to help substantiate my claims and damages. Further, I defer to the future expert(s) that will disclose expert report(s) on my behalf.

11.    Describe in detail every criminal offense (other than minor traffic citations constituting a misdemeanor) of which you been convicted, if any, during the seven-year period prior to the commencement of this lawsuit, regardless of the magnitude of the offense, and specify the dates and jurisdiction of the conviction, the offense(s) of which you were convicted, and any sentence imposed against you. Identify the time period which you were on probation or other wise under court supervision.

**ANSWER:** None currently known.

12.    Identify all expert witnesses whom you expect to testify at trial of this matter and, for each, state the subject matter on which they are expected to testify, the facts and opinions to which they are expected to testify, and a summary of the grounds for each opinion they expect to express.

**ANSWER:** As discovery remains underway, my attorneys have not finished evaluating what expert(s) would be presented for this case; however, I understand we will disclose expert(s) report(s) by the Court's deadline of February 14, 2022.

## VERIFICATION PAGE

I have read the foregoing Answers to Interrogatories and do swear that they are true and correct of the best of my knowledge and belief.

_(signature)_
Signature

Jeff Santos
Printed Name

STATE OF Florida
COUNTY OF Seminole

Sworn to or affirmed and signed before me on November, 30 th, 2021, by JEFF SANTOS.

_(signature)_
NOTARY PUBLIC or DEPUTY CLERK

Drew matthew Fulmer
[Print, type or stamp commission name of notary of deputy clerk]

Personally Known
X   Produced Identification
Type of Identification produced: Florida DL

DREW MATTHEW FULMER
Notary Public · State of Florida
Commission # GG 351825
My Comm. Expires Jul 4, 2023
Bonded through National Notary Assn.