**No. 23-11027**

In the

# United States Court of Appeals
## For the Eleventh Circuit

———————————

JOSE J. AYALA, JR., JEFF SANTOS, on behalf of themselves and as representatives of other class members similarly situated,

*Plaintiffs-Appellants*,

v.

NISSAN NORTH AMERICA, INC., a California corporation, and wholly owned subsidiary of Nissan Motor Company of Japan, d/b/a Nissan USA,

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court for
the Middle District of Florida
Case No. 6:20-cv-01625-RBD-RMN
Honorable Roy B. Dalton, Jr., Senior U.S. District Judge
Honorable Robert M. Norway, U.S. Magistrate Judge

———————————

**APPELLEE'S ANSWERING BRIEF**

———————————

Peter N. Farley
MCGUIREWOODS LLP
1075 Peachtree Street N.E.
35th Floor
Atlanta, GA 30309
T: (404) 443-5623

Matthew A. Fitzgerald
Kathryn M. Barber
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716

*Counsel for Defendant-Appellee Nissan North America, Inc.*

*Jose Ayala, Jr., et al. v. Nissan North America, Inc.*
Case No. 23-11027

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee Nissan North America, Inc. ("Nissan"), pursuant to 11th Cir. R. 26.1-1 through 26.1-3 and Fed. R. App. P. 26.1, hereby certifies that upon information and belief, Appellants' CIP and Corporate Disclosure Statement included in their August 3, 2023 Opening Brief lists all persons and entities with an interest in the outcome of this case.

Nissan North America, Inc., is a wholly-owned subsidiary of Nissan Motor Company, Ltd., with its principal place of business located in Tennessee. Nissan Motor Company, Ltd. wholly owns the outstanding capital stock of Nissan North America, Inc. and is a foreign corporation incorporated under the laws of Japan with its principal place of business located in Japan. Nissan Motor Company, Ltd. is publicly traded on NASDAQ under the ticker symbol "NSANY" and on the Tokyo Stock Exchange under the ticker symbol "7201".

Dated: October 5, 2023

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald

*Counsel for Defendant-Appellee*
*Nissan North America, Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

Appellee Nissan North America, Inc. does not request oral argument.  No law is in dispute in this appeal and the facts are straightforward.  If the Court prefers to hear oral argument, however, Nissan will readily participate.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...........................................i

TABLE OF CITATIONS ...............................................................................iv

INTRODUCTION ..........................................................................................1

STATEMENT OF THE ISSUES......................................................................3

STATEMENT OF THE CASE..........................................................................3

I.     Statement of facts. ...............................................................................3

II.    Relevant procedural history...................................................................5

SUMMARY OF THE ARGUMENT ................................................................7

ARGUMENT AND CITATIONS TO AUTHORITY .......................................8

I.     The District Court correctly granted Nissan's motion for summary judgment. ...........................................................................................8

    A.     Joint employment is a legal determination that requires weighing eight factors. ...........................................................9

    B.     The District Court properly weighed the eight joint employment factors based on the undisputed facts.................................10

    C.     The District Court correctly held that all eight factors weighed against joint employment. ...............................................14

        1.     Nature and degree of control...................................14

        2.     Degree of supervision. ..........................................18

        3.     Power to hire, fire, or modify Plaintiffs' employment conditions. ......................................................20

        4.     Power to set Plaintiffs' pay rates or payment methods............21

        5.     Preparation of payroll and payment of wages. ........................25

        6.     Ownership of facilities.............................................25

        7.     Performance of a specialty job integral to the business...........27

        8.     Relative investment in equipment and facilities. ....................29

     D.     The District Court correctly granted Nissan summary judgment on Plaintiffs' unjust enrichment claims.............................................31

II.    The District Court correctly denied Plaintiffs' motions for class and collective action certification.........................................................................32

CONCLUSION .......................................................................................................35

## <u>TABLE OF CITATIONS</u>

**Page(s)**

### Cases

*Aimable v. Long & Scott Farms*,
 20 F.3d 434 (11th Cir. 1994) ............................................................... 9, 14, 23-24

*Anderson v. Cagle's, Inc.*,
 488 F.3d 945 (11th Cir. 2007) ...........................................................34

*Antenor v. D & S Farms*,
 88 F.3d 925 (11th Cir. 1996) .........................................................9, 27

*Dugandzic v. Nike, Inc.*,
 807 F. App'x 971 (11th Cir. 2020) .............................................. 12-13

*Hipp v. Liberty Nat'l Life Ins. Co.*,
 252 F.3d 1208 (11th Cir. 2001) ...........................................................34

*King v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
 248 F. App'x 123 (11th Cir. 2007) ....................................................31

*Kopel v. Kopel*,
 229 So.3d 812 (Fla. 2017) ................................................................32

*Layton v. DHL Exp. (USA), Inc.*,
 686 F.3d 1172 (11th Cir. 2012) ................................................ 10, 17, 20, 26-29

*Martinez-Mendoza v. Champion Int'l Corp.*,
 340 F.3d 1200 (11th Cir. 2003) .........................................9, 15-16, 18-19, 27, 30

*Moore v. GEICO Gen. Ins. Co.*,
 633 F. App'x 924 (11th Cir. 2016) .............................................. 12-13

*Morgan v. Fam. Dollar Stores, Inc.*,
 551 F.3d 1233 (11th Cir. 2008) .................................................. 32-34

*Murray v. Auslander*,
 244 F.3d 807 (11th Cir. 2001) ...........................................................33

*Patel v. Wargo*,
 803 F.2d 632 (11th Cir. 1986) ...............................................................9

*Tallahassee Mem. Reg'l Med. Ctr. v. Bowen*,
  815 F.2d 1435 (11th Cir. 1987) ............................................................31

*Valle v. Ceres Env't Servs., Inc.*,
  No. 21-12020, 2022 WL 1667015 (11th Cir. May 25, 2022) ..... 17-18, 23, 26-30

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Litig.*,
  467 F. Supp. 3d 849 (N.D. Cal. 2020) ................................................24

**Statutes**

Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.* .....................................5

29 U.S.C. § 206 ............................................................................9

29 U.S.C. § 207 ............................................................................9

Fla. Stat. § 320.645 ...................................................................3, 28

Fla. Stat. § 320.696(1) ..................................................................4

Fla. Stat. § 448.110 ...................................................................5, 9

## **INTRODUCTION**

This appeal centers on who qualifies as an employer of auto mechanics that worked for and were paid by independent car dealerships in Florida. The dealerships hired their mechanics, paid them different rates, had their own Human Resources departments, and otherwise controlled the daily aspects of the mechanics' jobs. But the plaintiff mechanics contend that even so, Nissan—a car manufacturer that contracts with dealerships to sell and service Nissan vehicles— also operated as their employer. They are wrong.

Nissan played no role in Plaintiffs' employment, much less the direct, deeply involved role that this Court's joint employment test requires. Plaintiffs' contrary arguments rest on a dealership manual and dealership agreement that set high-level contract standards for the dealerships, but do not touch the specifics of Plaintiffs' daily employment or address their pay. Under Plaintiffs' theory, every manufacturer or vendor that contracts with a distributor or servicer (and provides general standards for how that distributor should meet its contractual obligations) automatically becomes a joint employer of that distributor's employees. That theory falls flat in the face of what joint employment requires: specific control over, and direct involvement in, employees' work conditions and activities as well as their compensation.

Nissan has neither.  Not only does Florida law expressly prohibit Nissan from operating dealerships—those third-party dealerships must run independently from manufacturers like Nissan—but *only* the dealerships handle hiring, negotiating and paying wages, scheduling shifts, assigning and supervising specific tasks, imposing discipline, and granting promotions to their mechanics (who are also referred to as service technicians).  Nissan plays no role in these activities.  Nor does it play any role in the technicians' pay, which each dealership decides according to its own compensation structure.  Indeed, so individual are the dealerships' operations and pay policies that technicians (including Plaintiffs here) move between dealerships in search of better pay—conduct that would make no sense if Nissan employed those technicians and uniformly decided their wages.

The District Court thus correctly evaluated the joint employment factors to conclude that Nissan does not exert the requisite control over Plaintiffs' employment, and this Court should affirm summary judgment on the Fair Labor Standards Act and Florida Minimum Wage Act claims.  For the same reason, Plaintiffs' unjust enrichment claims and class certification arguments fail, and the District Court's correct rulings on both should also be affirmed.

<u>**STATEMENT OF THE ISSUES**</u>

I.    Whether the District Court correctly granted Nissan summary judgment when all the evidence it evaluated, including Nissan's dealer manual and contract setting general standards for the independent dealers that employed and paid Plaintiffs, showed that Nissan was not Plaintiffs' joint employer because it did not control Plaintiffs' employment conditions or pay?

II.   Whether the District Court correctly denied collective action and class certification when Plaintiffs, who work for different employers, are not similarly situated or subject to any common compensation policy?

<u>**STATEMENT OF THE CASE**</u>

**I.    Statement of facts.**

Nissan North America, Inc. manufactures and distributes automobiles. Dkt. 161-1, p. 2-3.[1] Under Florida law, Nissan may neither sell directly to nor service vehicles for customers. Fla. Stat. § 320.645; Dkt. 161-1, p. 2. So Nissan contracts with third party, independent dealerships to perform these activities. Dkt. 161-1, p. 2; Dkt. 161-2, p. 2. Each such dealership executes a Dealer Sales and Service Agreement (Dealer Agreement) with Nissan that authorizes the dealership to sell Nissan vehicles and obligates it to service vehicles covered by Nissan warranties. Dkt. 161-1, p. 2; Dkt. 153-6. These contracts do not preclude the dealerships, which are independently owned and operated, from selling or servicing other

---

[1] "Dkt. __" citations are to the district court docket. Citations to public record pages are to the page numbers that appear in the header generated by the court's ECF system. Citations to sealed record pages are to the page numbers that appear in the documents.

manufacturers' automobiles or performing other, non-warranty work on Nissan vehicles—and many dealers do both.  Dkt. 161-1, p. 2-3; Dkt. 161-4, p. 2.

The independent dealerships that contract with Nissan have their own Service Departments for performing work covered by a Nissan warranty, work paid for by a customer, and internal work to prepare used vehicles for sale.  Dkt. 161-4, p. 2-3; Dkt. 161-1, p. 3.  Nissan is not required to and does not compensate dealers for performing customer-paid or internal work on Nissan vehicles.  But Florida law requires Nissan to pay dealers for warranty work.  Dkt. 161-1, p. 4; Fla. Stat. § 320.696(1).

For every warranty claim, Nissan pays a dealer an amount determined by multiplying a "flat-rate time" by that dealer's "approved labor rate."  Dkt. 161-1, p. 4.  The "approved labor rate" is individual to each dealership, while the "flat-rate time" is the time that Nissan (based on its own research and studies) has determined the "average" service technician should take to complete a specific repair (and is generally an overestimate).  Dkt. 161-1, p. 4.  Nissan's Assurance Products Resource Manual (APRM) lays out the processes and requirements dealers must follow to get paid for warranty claims.  Dkt. 161-1, p. 4; Dkt. 153-4; Dkt. 153-6.

While Nissan and the dealers operate at an arms-length with respect to these warranty claims (and in all other respects), the dealers handle the specifics of how

4

warranty work and all other repairs are performed—and who performs that work for what pay. The dealerships hire their own service technicians to perform all forms of repairs at their dealerships and pay those technicians directly, without Nissan's involvement. Dkt. 161-1, p. 9-10; Dkt. 161-4, p. 3.

Plaintiffs Jose J. Ayala, Jr. and Jeff Santos worked as service technicians at four different independent dealerships in Florida that had contracts with Nissan— Ayala for two dealerships in Orlando and Clermont and Santos for three dealerships in Orlando. Dkt. 161-6, p. 3; Dkt. 161-7, p. 3.

## II.    Relevant procedural history.

Plaintiffs brought a putative collective and class action against Nissan alleging violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*; violations of Florida Minimum Wage Act (FMWA), Fla. Stat. § 448.110; and claims for unjust enrichment. Dkt. 40, p. 29-42. Plaintiffs alleged that Nissan was a "joint venture employer" with the dealerships that employed them. Dkt. 40, p. 12. They asserted that Nissan's "flat-rate" payments to the dealers for warranty work, as well as requirements that Plaintiffs purchase their own tools, led to Plaintiffs being underpaid. Dkt. 40, p. 18-20.[2]

---

[2] Four opt-in plaintiffs also elected to join the putative collective action: Santiago Cadenas Mesa, Sergio Serrano, Andre Wright, and Edwin Christiansen.

At the close of discovery, the District Court denied Plaintiffs' motions to certify a class and an FLSA collective action (Dkts. 153 & 154) and granted Nissan's motion for summary judgment (Dkt. 161). Dkt. 194, p. 9. The court held that, under this Court's eight-factor test for joint employment, Nissan did not qualify as Plaintiffs' joint employer. Dkt. 194, p. 4. Each factor, the District Court held, "weigh[ed] against a finding of joint employment." Dkt. 194, p. 4-8. And because "all the factors weigh[ed] against" that finding, the District Court "conclud[ed] that Nissan is not Plaintiffs' joint employer as a matter of law." Dkt. 194, p. 9. This conclusion meant Nissan was entitled to summary judgment on its FLSA and FMWA claims. Dkt. 194, p. 9. It also meant that Nissan was entitled to summary judgment on the unjust enrichment claims, as Plaintiffs had not directly conferred any benefit on Nissan, an entity that did not employ them. Dkt. 194, p. 9 n.1.

The District Court's joint employment decision also resolved the class and collective action certification questions. Because "Plaintiffs all work for different dealerships and not Nissan, the inquiries as to each one would be individualized and unwieldy." Dkt. 194, p. 9 n.2. Given the lack of similarly situated Plaintiffs pursuing common claims susceptible to classwide proof, the District Court denied both certification motions. Dkt. 194, p. 9 n.2. This appeal followed.

## SUMMARY OF THE ARGUMENT

The District Court correctly granted Nissan summary judgment and denied certification of the putative collective and class action.  Plaintiffs' arguments to the contrary rely on misreading the record and misapplying the law.

This Court's eight-factor test for joint employment requires applying the undisputed facts to determine each factor's weight for or against joint employment. That is exactly what the District Court did.  It neither omitted nor improperly weighed evidence.  Instead, the record is clear that the District Court evaluated all the evidence (which presented no factual disputes), including the APRM, Dealer Agreement, and related documents Plaintiffs assert are central to proving their case.

The problem for Plaintiffs is that none of these documents say what Plaintiffs allege or argue, and as a result, none support their claims.  In particular, they do not reflect that Nissan had any control over or involvement in what or how Plaintiffs were paid or in the other specific terms and conditions of their employment.  At every factor, these documents fall far short of showing that Nissan—rather than the independent dealerships that hired Plaintiffs and controlled all aspects of their employment—acted in any way as Plaintiffs' employer.  The District Court thus correctly held that each factor weighed against joint employment, and ultimately granted Nissan summary judgment on this issue.

7

For related reasons, the District Court correctly denied certification.  In trying to show otherwise, Plaintiffs simply invoke the same arguments that fail as to joint employment, meaning this Court can simply affirm denial of certification for the same reasons it affirms the grant of summary judgment.

Indeed, there is little if any daylight between the joint employment and certification analyses.  Certification requires "similarly situated" plaintiffs—*i.e.*, plaintiffs subject to the same employer's payment policies.  Because Plaintiffs were not employed by Nissan or subject to any payment policy Nissan imposed, Plaintiffs could not meet this standard.  This Court should affirm.

## ARGUMENT AND CITATIONS TO AUTHORITY

## I.     The District Court correctly granted Nissan's motion for summary judgment.

The District Court faithfully applied this Court's joint-employment standard to the undisputed facts to reach the correct conclusion that Nissan was not Plaintiffs' employer.  Plaintiffs' contrary arguments misconstrue both the relevant standard and what the District Court did, and they fail to overcome the overwhelming evidence that they were exclusively employed by the independent dealerships and not by Nissan.

### A.    Joint employment is a legal determination that requires weighing eight factors.

Only an "employer" can be liable under FLSA and the FMWA.  29 U.S.C. §§ 206, 207; Fla. Stat. § 448.110(3); *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996).  Whether an entity qualifies as a worker's "joint employer" is a legal question this Court reviews de novo.  *Aimable v. Long & Scott Farms*, 20 F.3d 434, 440 (11th Cir. 1994).  Though any "individual findings of fact" that lead "to that legal determination" are subject to clear error review, the ultimate legal question of joint employment is for the judge.  *Patel v. Wargo*, 803 F.2d 632, 634 (11th Cir. 1986).  So when, as here, the material facts relevant to each factor are not in dispute, joint employment status is a pure question of law the judge appropriately resolves.  *See, e.g.*, *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1210-15 (11th Cir. 2003) (affirming grant of summary judgment when, on undisputed facts, factors weighed against joint employment).

To decide this legal question, this Court evaluates eight factors, none of which are dispositive: (1) the nature and degree of control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the power to determine the pay rates or the methods of payment of the workers; (4) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; (5) preparation of payroll and the payment of wages; (6) ownership of the facilities where work occurred; (7) performance of a specialty job integral to the business;

and (8) investment in equipment and facilities. *Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1176 (11th Cir. 2012). That is, the Court (and trial court, in the first instance) assesses the undisputed facts relevant to each factor to decide whether that factor *weighs* for or against finding joint employment. *See, e.g.*, *id.* at 1178-81 (discussing whether each factor "weighs" for or against joint employment). That is exactly what happened below.

### B. The District Court properly weighed the eight joint employment factors based on the undisputed facts.

Plaintiffs center their brief on an incorrect premise: that the District Court omitted or weighed evidence to improperly resolve factual disputes. The court did neither. Nor were there any factual disputes precluding entry of summary judgment.

***The District Court considered all the evidence.*** A straightforward review of the record refutes Plaintiffs' assertion that the District Court did not consider the APRM, the Dealer Agreement, Nissan's technical bulletins, Plaintiffs' declarations, or any other relevant evidence. Though the District Court did not expressly name those documents in its written decision, it plainly evaluated them and Plaintiffs' (meritless) arguments about what they showed.

Indeed, the District Court frequently cited to Plaintiffs' *own evidence* when evaluating the joint employment factors, including the evidence Plaintiffs contend the court ignored. *See, e.g.*, Dkt. 194, p. 4-5 (citing exhibits to Plaintiffs'

10

certification motion, Dkt. 153).  For example, in assessing Nissan's purported

control over Plaintiffs' employment, the District Court acknowledged that Nissan

"requires that mechanics clock on to one [warranty] project at a time"—a mandate

that comes from the APRM.  Dkt. 194, p. 4 (citing Dkt. 161-11, p. 33 (testimony

quoting relevant portion of the APRM)).  The court also referenced Nissan's

"general requirements dealers must follow" to receive payment on warranty

claims, requirements that are laid out in the APRM and related Nissan guidance.

Dkt. 194, p. 4 (citing Dkt. 161-11, p. 98); *see also* Dkt. 161-11, p. 96 (testifying

that relevant process comes from "either the APRM or the flat-rate manual").

And when evaluating Nissan's power to determine Plaintiffs' pay rates or

methods—the issue that "form[ed] the gravamen of Plaintiffs' argument"—the

District Court referenced and refuted Plaintiffs' contention that the flat-rate system

indirectly affected their pay.  Dkt. 194, p. 6.  In doing so, the court pointed to pages

13-16 of Plaintiffs' certification motion and page 13 of their summary judgment

opposition.  Dkt. 194, p. 6 (citing Dkt. 153, p. 13-16; Dkt. 169, p. 13).  Those parts

of Plaintiffs' briefs focused almost entirely on (1) the APRM, *see* Dkt. 153, p. 13-

15 (referencing APRM and citing APRM excerpts at Dkt. 40-1), Dkt. 169, p. 13;

(2) Plaintiffs' declarations, *see* Dkt. 153, p. 14-16 (citing Dkts. 66-1 & 66-2);

(3) "various Nissan bulletins," Dkt. 153, p. 14; and (4) the Dealer Agreement, *see*

Dkt. 169, p. 13.

11

These references make plain that the District Court assessed the evidence that Plaintiffs contend is so central to their case. The court simply found it unavailing to show that Nissan sufficiently controlled Plaintiffs' pay or otherwise change the weight of any factor in the joint employer analysis. Nothing supports Plaintiffs' assertion that the District Court somehow overlooked or ignored the evidence from the APRM, Dealer Agreement, technical bulletins, or otherwise, especially when those documents formed the core of Plaintiffs' arguments in briefing and before the court. *See* Dkt. 203, p. 5 (arguing at hearing that joint employment was shown by "the Assurance Products Resource Manual . . . their dealership agreements, the bulletins that they publish . . . , their policies and procedures, their behavior, their corporate representative's deposition testimony"). Indeed, Plaintiffs themselves highlight the District Court's awareness of their reliance on the APRM even before it decided the summary judgment motion, as they quote the court's discussion of the same at an earlier hearing. Opening Br. 15.

Nor is this situation anything like those in *Moore v. GEICO General Insurance Co.*, 633 F. App'x 924 (11th Cir. 2016), or *Dugandzic v. Nike, Inc.*, 807 F. App'x 971 (11th Cir. 2020)—neither of which involved the legal question of joint employment. *Contra* Opening Br. 12-13. In *Moore*, the district court expressly refused to credit as accurate witness deposition testimony and "made no mention whatsoever" of expert testimony, despite both pieces of evidence

12

supporting the non-movant's position on summary judgment. 633 F. App'x at 930. The District Court here repeatedly and expressly considered Plaintiffs' evidence and never refused to credit it as true. It simply found that evidence unavailing under the joint employment standard.

In *Dugandzic*, a Title VII action, the district court "dismiss[ed] out of hand any evidence of alleged harassment that was not facially based on [the plaintiff's] national origin," and thus failed to evaluate the full context of the employer's conduct to decide whether a hostile work environment existed. 807 F. App'x at 976. Again, the District Court here never dismissed or rejected any evidence. It acknowledged and considered that evidence but determined that it did not satisfy the legal test for joint employment. That conclusion was correct.

***The District Court weighed the factors—not the evidence.*** The record also refutes Plaintiffs' view that the District Court engaged in any improper weighing of evidence or resolved any factual disputes. Indeed, there were none to resolve.

Take the APRM and Dealer Agreement: everyone agreed that those documents existed, and their contents were undisputed. That is, there was no conflicting evidence about whether the APRM governed, or what it said. The parties simply disagreed about whether those documents (along with the other evidence) showed the necessary control over Plaintiffs' pay and other conditions of

13

employment.  That "hotly disputed issue" was not a factual one, *contra* Opening Br. 14—it was a legal question controlled by this Court's precedents.

The same holds true across the board.  There were no conflicting documents or competing testimony about what the relevant policies or procedures were, or what Nissan did or did not do.  There was a single universe of undisputed evidence about how Nissan, the dealerships, and Plaintiffs operated and interacted.  The only question was how that evidence played out under this Court's joint employment precedents.  And the District Court properly applied those precedents to reach the legal conclusion that the eight factors weighed against finding that Nissan was Plaintiffs' joint employer.

### C.    The District Court correctly held that all eight factors weighed against joint employment.

As the District Court held, each of the relevant factors comes out against joint employment.  Nothing in Plaintiffs' evidence or argument shows otherwise.

### 1.    *Nature and degree of control.*

"Control arises" only when a party "goes beyond general," macro-level instructions and "begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work."  *Aimable*, 20 F.3d at 441.  That "overly active role" arises if the party decides things like "(1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when work begins each day; (4) when the laborers shall start and stop

14

their work throughout the day; and (5) whether a laborer should be disciplined or retained." *Martinez-Mendoza*, 340 F.3d at 1209-10.

The undisputed evidence (including Plaintiffs' own testimony) shows that Nissan does none of these things. The individual dealerships operate according to their own handbooks and employment practices—Nissan plays no role in framing the dealers' management structure or practices. Dkt. 161-4, p. 3; Dkt. 161-10, p. 27. Each dealer has its own Human Resources department and service manager, and each and decides who to hire (and fire) on what terms; how and how much to compensate technicians; and the other relevant terms of employment, including benefits and discipline—Nissan does not make or influence these decisions. Dkt. 161-2, p. 2-3; Dkt. 161-3, p. 2-3; Dkt. 161-4, p. 3-6; Dkt. 161-9, p. 57-61; Dkt. 161-10, p. 79-80, 88.

And the dealers make their own decisions about mechanics' work schedules and assigning technicians specific tasks. Dkt. 161-4, p. 5-6; Dkt. 161-9, p. 113-15. Indeed, so individual is each dealer's operations that each "has its own process for assigning service technicians to perform warranty work," in which "Nissan does not play any role." Dkt. 161-1, p. 7; *see also* Dkt. 161-9, p. 115 ("Q: So Sutherlin [Nissan] really was a different type of operation than Reed [Nissan]? A. Yes."). Thus, Nissan "did not—and could not—assign [workers] or tasks, dictate hiring decisions, design the [technicians'] management structure, govern [their] work

15

schedule, or implement [worker] discipline." *Martinez-Mendoza*, 340 F.3d at 1210.

Plaintiffs do not disagree with any of this evidence. They simply assert that the APRM, Dealer Agreement, and various technical bulletins still show the requisite control because they reflect that Nissan will only pay dealers for warranty work under specific conditions. Opening Br. 6, 20. For example, the APRM requires that when dealers submit a warranty claim, the Work Order must identify the technicians who worked on the repair and the times that each "clock[ed] on" to and "clock[ed] off" from working on the repair. Dkt. 153-4, p. W-34. This record-keeping allows Nissan to determine whether the time recorded "reasonably support[s] the repair claimed" such that it will pay the *dealer* the requested claim amount. Dkt. 153-4, p. W-34. The APRM also provides that technicians "may work on only one vehicle at a time" for warranty work, that they have completed Nissan's Technician Training for the warranty repair they are performing, and that they verify the conditions requiring repair in the Work Order. Dkt. 153-4, p. W-37-39. The technical bulletins, meanwhile, explain how to address particular issues that might arise in Nissan vehicles. Dkt. 153-7, p. 1-35.

As the District Court held, this kind of high-level oversight primarily *directed at the dealers* does not amount to the direct "control" over *Plaintiffs* that joint employment requires. Dkt. 194, p. 4. This Court does "not consider the fact

an entity generally directed other entities" "where" and "how" to perform work "to be indicative of control," *Valle v. Ceres Env't Servs., Inc.*, No. 21-12020, 2022 WL 1667015, at \*5 (11th Cir. May 25, 2022)—even when those directives "directly impact[]" an employee's workday and work conditions, *Layton*, 686 F.3d at 1178. Such an "indirect type of control" is too "abstract" to qualify as "the type of control exercised by an employer." *Id.*

The APRM and related documents are macro-level directives to the *dealers* that contract with Nissan; they set out general standards for how warranty repairs are performed and dealers compensated, so that dealers can satisfy their contractual obligations to Nissan. That is, these documents reflect Nissan's "objectives" that the dealers, and therefore their technicians, "were tasked with accomplishing," but they do not reflect Nissan's involvement "with the specifics of how those goals would be reached." *Id.* They neither "apportion tasks to individuals, specify how many individuals should be assigned" to complete each repair, nor "structure the chain of command" overseeing the mechanics. *Id.* Thus, while Nissan's guidelines "may have incidentally impacted" Plaintiffs' "working conditions," they do not reflect that Nissan "exert[ed] control as an employer would have." *Id.*

For example, the clock-in and clock-out requirement Plaintiffs emphasize falls short of this kind of specific control—Nissan requires that information to assess whether a claim amount is appropriate for payment to the *dealer*, not to

17

direct or ensure that any one person works on a particular task on any given day or at any given time. The technical bulletins, by simply providing steps for identifying and repairing issues with Nissan vehicles, similarly fail to show direct control. They do not assign a specific technician to perform those repairs, specify how many technicians may work on the repair, or decide on which day and which shift any one technician will work on such a repair. *See, e.g.*, Dkt. 153-7, p. 1-35. The same is true of the general requirements that whichever technician works on a repair be trained to perform that specific repair and work on one vehicle at a time.

All these standards aimed at quality control writ large do not delve into the specifics of which technicians at what dealerships work on which cars when. *See Martinez-Mendoza*, 340 F.3d at 1210-11 ("contract specifications that set [immediate employer's] performance standards" are type of "indirect control" insufficient to show joint employment); *Valle*, 2022 WL 1667015, at *5 (requirement that contractor approve laborers' work for it to be considered complete did not reflect control). Without that level of granularity, they simply do not show the direct, employer-like control that joint employment requires. The District Court correctly held that this factor weighs against joint employment.

### 2.    *Degree of supervision.*

"[I]nfrequent assertions of minimal oversight do not constitute the requisite degree of supervision." *Martinez-Mendoza*, 340 F.3d at 1211. Plaintiffs do not

even have that.  They simply assert that the APRM, technical bulletins, and

Dealership Agreement show the necessary level of supervision—again, because

they require dealers to meet Nissan's standards to get paid for warranty work.

Opening Br. 6, 21.  But just as those documents do not show direct control over

Plaintiffs, they also do not show *any* supervision by Nissan of Plaintiffs' day-to-

day work, much less the regular supervision required under this factor.  They

simply reflect the general oversight that an entity may perform to ensure

compliance with contractual standards, not the supervision an employer performs.

*See Martinez-Mendoza*, 340 F.3d at 1211 (contractor's personnel visited job sites

not to supervise workers but "simply to ensure that [subcontractor] complied

with . . . contract specifications").

　　It is undisputed that only the dealers and their managers oversee the

mechanics' daily activities—and do so according to their individual management

structures.  *See* Dkt. 161-9, p. 28-32 (describing supervision frameworks at

different dealerships); Dkt. 161-10, p. 28-29 (describing one dealer's system for

assigning work to technicians).  Personnel from Nissan corporate only visit the

dealerships when mechanics need technical assistance with a repair, not to perform

any regular, supervisory role.  Dkt. 153-1, p. 97-98; *see also* Dkt. 153-2, p. 50-51

("Q. So other than the tech line and the engineers, what contact did you have with

Nissan corporate employees? A. None that I can recall.").  The APRM and Dealer

Agreement do not override this evidence or the District Court's correct conclusion that this factor also weighs against joint employment.

### 3. *Power to hire, fire, or modify Plaintiffs' employment conditions.*

Plaintiffs resort again to the APRM and Dealer Agreement to assert that, by listing job titles and positions and requiring technicians to undergo a one-day training, Nissan has the necessary degree of power over dealers' employment decisions. Opening Br. 22-23. But this evidence shows, at best, "minimal involvement with the employment process." *Layton*, 686 F.3d at 1179; *see also id.* (only "minimal involvement" where contractor required workers to pass a background check and made "business decisions that impacted [workers'] hours"). Any such "minimal involvement" does not make Nissan a joint employer or give it power over hiring or firing. *See id.* Instead, the record makes plain that Nissan does not involve itself in any hiring or firing decisions, directly alter Plaintiffs' terms of employment, or otherwise modify their working conditions.

Only the dealerships do that. Plaintiffs' own testimony reflects that they were hired directly by the dealers; that those dealers operate according to their own employment handbooks and with their own HR departments; and that the dealers individually decide on benefits, work assignments, time off, and discipline. Dkt. 161-9, p. 57-61, 64-65, 85-86, 89; Dkt. 161-10, p. 25-26, 41-42, 79-81. As with the previous factors, the APRM and Dealer Agreement do not show the direct

authority and involvement required.  The District Court correctly held that this factor weighs against joint employment.

### 4.    *Power to set Plaintiffs' pay rates or payment methods.*

Plaintiffs contend that Nissan controls their pay by paying dealers for warranty work using the flat-rate system.  Opening Br. 22.  This view contradicts the record and the law.

*First*, there is no nexus between what Nissan pays dealers for warranty work and what dealers pay technicians.  And neither is consistent across the dealerships that contract with Nissan—refuting Plaintiffs' assertion that any "common policy" governs technicians' pay.  *Contra* Opening Br. 22.

Each dealer has its own "approved labor rate," negotiated with Nissan based on the rates that dealer charges for customer-paid work.  Dkt. 161-11, p. 86-87.  These rates range from $100 an hour to closer to $300, depending on the dealership.  Dkt. 161-1, p. 5-6.  To pay a dealer on a warranty claim, Nissan multiplies that dealer's individual approved labor rate against the flat-rate time for the repair at issue.  So even the dealerships get paid different amounts based on their unique circumstances.

More importantly, dealerships pay their technicians separately from this process, with no link between the warranty claim amounts Nissan pays out to dealers and the wages dealers pay to their mechanics.  Nissan does not require that

dealers compensate their employees in any one way or amount.  Dkt. 161-4, p. 5.

Instead, dealers are free to—and do—employ different compensation structures

based on their assessment of how best to attract and retain talent.  Dkt. 161-4, p. 5

("Depending on specific circumstances, such as the local job market . . . an

independent dealer may compensate its service technicians on an hourly basis, on a

flat-rate basis, or on some other basis."); *see also* Dkt. 161-12, p. 38 (discussing

varying forms of compensation by a single dealership); Dkt. 161-14, p. 32

(testimony that dealership paid mechanic at different rates based on complexity of

customer-paid repair).

Depending on the dealership, mechanics may make between $20 and $30 an

hour—varying amounts with no connection to the much higher warranty payouts

Nissan gives dealerships.  Dkt. 161-14, p. 59-60 (from $25 to $30 an hour); Dkt.

161-9, p. 63 ($32 an hour); Dkt. 161-10, p. 12 ($20 an hour).  Indeed, warranty

work is not even the bulk of a mechanic's work.  As a result, their wages mainly

compensate them for performing customer-paid and internal work for which

Nissan does not pay dealers (or otherwise provide guidance).  Dkt. 161-1, p. 3, 9.

There is simply no connection between the warranty payouts to dealers and

Plaintiffs' wages that are set by dealers.

Reflecting that it is the dealerships and not Nissan that decide technicians'

pay, Plaintiffs both *changed dealerships to make more money*.  Dkt. 161-9, p. 63;

Dkt. 161-10, p. 16; *see also* Dkt. 161-14, p. 59 (opt-in plaintiff testifying that "the pay was definitely a little bit better" at new dealership).  This conduct would make no sense if dealerships that contracted with Nissan operated under one policy for paying their mechanics tethered to the flat-rate system.  Put simply, they do not.  Because it is the dealers with which Plaintiffs negotiated their pay rates and the dealers that paid Plaintiffs, Plaintiffs were economically dependent only on the dealers.  *See Aimable*, 20 F.3d at 442.

*Second*, even if Nissan's flat-rate system has some indirect effect on mechanics' take-home pay (it does not), an entity does not set or control a worker's pay just because it pays their employer.  *See id.* (rejecting "leap of logic" that purported joint employer "indirectly controlled [workers'] rate of pay" because it controlled amount their employer received); *see also Valle*, 2022 WL 1667015, at *6 ("[I]t is not enough for this factor to support a finding of joint employment if the employee is merely paid by its employer from funds paid to the employer by the purported joint employer as a part of a contract to deliver services.").  What matters is who "determine[s] what wages to pay" which workers and "when (and if) to increase the workers' wages."  *Aimable*, 20 F.3d at 442.  That entity is the dealership that employs the mechanic.  It is not Nissan.

*Third and finally*, that Nissan makes occasional incentive payments to technicians whose dealerships enrolled in the Invest in the Best Program does not

23

undermine this factor's weight.  That program is voluntary, and *dealerships* decide whether to participate (after which their employees may elect to participate, or not), again showing that the dealers control how their employees are compensated. Dkt. 161-11, p. 130-31.  None of Plaintiffs, named or opt-in, participated in this program or received any direct payment from Nissan through the program or otherwise.  Dkt. 165, p. 14 n.12.

Moreover, any incentive payments would simply add to the core compensation that only the dealerships decided and controlled—they would not reflect Nissan's control over Plaintiffs' pay rates or method of payment, nor would they make Plaintiffs economically dependent on Nissan.  *Cf. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Litig.*, 467 F. Supp. 3d 849, 863 (N.D. Cal. 2020) (payment of incentive compensation does not amount to "control over wages"); *see also Aimable*, 20 F.3d at 442 (control over pay involves "specifically determin[ing] the amount of pay," including "whether to pay on an hourly or piece-rate basis" and "deduct[ing]" taxes).

Because Nissan does not control technicians' rate of pay or payment methods, the District Court correctly held that this factor weighs against joint employment.

## 5.    *Preparation of payroll and payment of wages.*

For similar reasons, the District Court also correctly weighed this factor against joint employment.  As the District Court emphasized, only the dealerships prepare payroll and pay technicians their wages.  Dkt. 161-4, p. 7.  The District Court viewed payments under the Invest in the Best program as somewhat weakening this factor, Dkt. 194, p. 7, but as the court recognized, this factor still cut against joint employment even accounting that for program.  After all, no one in this action was ever paid directly by Nissan.  And even if they were, limited and occasional incentive payments on top of regular wages do not reflect Nissan's control over wages or Plaintiffs' economic dependence on Nissan.  This factor weighs against joint employment as well.

## 6.    *Ownership of facilities.*

There is no dispute that Nissan does not own the dealership facilities where Plaintiffs work.  Dkt. 161-1, p. 2.  That should resolve this factor.  But Plaintiffs assert that the Dealership Agreement shows that Nissan "controls" the dealership facilities.  Opening Br. 24.  They are wrong.

Nissan does not control the dealers' facilities in the necessary sense.  The Dealer Agreement sets out general standards for "Dealership Facilities" to ensure that dealers will be able to "effectively perform [their] responsibilities under" their contracts with Nissan and effectively compete against "principal competitors."

Dkt. 153-6, p. 3; *see also id.* ("[T]he Dealership Facilities shall be satisfactory in space, appearance, layout, equipment, [and] signage" according to Nissan's "Guides").  The Dealer Agreement also generally requires dealers to be "in compliance with all applicable federal, state and local laws."  Dkt. 153-6, p. 11. That is, Nissan simply requires dealerships to operate out of facilities that will make them competitive and allow them to satisfactorily sell and service Nissan vehicles (while avoiding legal trouble that might interfere with their contractual obligations).  That's it.

"Control" requires more: direct power over the working conditions and daily activities in a facility that enable the entity "to prevent labor law violations." *Layton*, 686 F.3d at 1180; *see Valle*, 2022 WL 1667015, at *6 (finding some level of "control" over facilities when purported joint employer "could remove any subcontractor from the worksites for any reason").  Nothing in the Dealer Agreement or any other evidence shows this level of control.  Nissan does not impose or monitor safety procedures or otherwise oversee the daily working conditions relevant to potential labor law violations—the Dealer Agreement says nothing about either.  Nor does Nissan have the power to remove a technician from a worksite or otherwise impact specific work assignments and employees, like the purported joint employer in *Valle* did (and even that level of "control" did not

make this factor "especially probative" given the immediate employer's ownership of the equipment). *Valle*, 2022 WL 1667015, at *6.

No evidence reflects that Nissan owns or controls the dealers' facilities in the necessary sense. The District Court correctly held that this factor weighs against joint employment.

### 7.  *Performance of a specialty job integral to the business.*

Plaintiffs are also wrong that technicians perform a specialty job integral to Nissan's business. This factor favors joint employment only under specific circumstances: when workers perform a routine, "specialized task in an assembly-line environment." *Valle*, 2022 WL 1667015, at *7 (citing *Layton*, 686 F.3d at 1180). Under those circumstances, this factor "is probative of joint employment because a worker who performs a routine task that is a normal and integral phase of" the employer's production process "is likely to be dependent" on that overall production process—and that employer. *Antenor*, 88 F.3d at 936; *see also Martinez-Mendoza*, 340 F.3d at 1212 (the more "repetitive" and "rote" the task, and "[t]he lower the worker's skill level, . . . the greater the likelihood of his economic dependence on the person utilizing those services").

Technicians do not perform a low-skill, "routine line-job." *Antenor*, 88 F.3d at 936. Exactly the opposite. They perform a skilled job they could perform (and did perform) for any dealership on any type of vehicle. *See* Dkt. 161-9, p. 6-7

27

(testimony that Ayala currently works at Honda dealership); Dkt. 161-9, p. 20 (testimony that technicians at Nissan dealership would service other vehicle makes); *see also Layton*, 686 F.3d at 1180 (drivers did not perform specialty job integral to business when they could have used their vehicles "to serve other companies needing delivery services"). And they perform that job individually, rather than side-by-side with Nissan employees on an assembly line. *See Layton*, 686 F.3d at 1180. This factor thus weighs strongly against joint employment.

Plaintiffs try to escape this conclusion by making an argument this Court has repeatedly rejected: that this factor favors joint employment because the maintenance and service of Nissan vehicles is integral to Nissan's business, a fact supposedly reflected by Nissan's advertising and Dealer Agreement. *See* Opening Br. 22; Dkt. 169, p. 16-17. Put differently, they argue that they perform one of the services that Nissan "is in the business of providing, and so they must be integral to [Nissan's] business." *Valle*, 2022 WL 1667015, at *7. They are incorrect—under Florida law, Nissan (as a manufacturer) is not in and cannot be in the business of servicing and maintaining vehicles. *See* Fla. Stat. § 320.645 (a manufacturer or distributor may not "directly or indirectly own, operate, or control . . . a motor vehicle dealership").

But either way, Plaintiffs' purported importance to Nissan's business does not make them economically dependent on Nissan. This Court has rejected this

view at least twice and should do so again here. *See Layton*, 686 F.3d at 1180 (though drivers "performed a crucial task for DHL," it was not analogous enough to assembly-line work); *Valle*, 2022 WL 1667015, at *7 ("We rejected a similar argument in *Layton*, and we reject it here."). This factor weighs against joint employment.

### 8. *Relative investment in equipment and facilities.*

The final factor also weighs against joint employment. This factor matters because "workers are more likely to be economically dependent on the person who supplies the equipment or the facilities" that the workers use. *Layton*, 686 F.3d at 1181. As the District Court held, there is no record evidence that Nissan supplies any equipment or facilities the technicians use. Dkt. 194, p. 8. Not only do the dealers own and operate their own facilities, but technicians buy their tools and take them with them to different dealership jobs (indeed, this fact underlies some of Plaintiffs' own claims of underpayment). Dkt. 161-14, p. 58.

Plaintiffs contend that this story is incomplete, because Nissan invests in "personnel (i.e. Technicians)" through Invest in the Best incentive payments as well as training programs, "management tools and requirements," "reimbursements" and "claim centers." Opening Br. 26. Even putting aside that Plaintiffs again over-inflate the general provisions of the APRM and Dealer Agreement, such purported investments in or reimbursements for labor are not

"relevant to this factor."  *See Valle*, 2022 WL 1667015, at *7 (rejecting similar

argument that "laborers and manpower" were employers' main assets).  None of

these things are investments in "equipment" or "facilities."  *Cf. Martinez-Mendoza*,

340 F.3d at 1214 (factor weighed against joint employment when purported joint

employer did not provide workers' "housing, transportation, tools, etc.").  And

even if Nissan somehow indirectly invests in dealers' facilities—though there is no

evidence of that— any relative investment it makes pales in comparison to the

dealerships' primary investments in and ownership of their facilities and

equipment.  The District Court correctly weighed this factor against joint

employment.

***

In sum, as the District Court held, all eight factors weigh strongly against

joint employment, meaning Nissan cannot be liable under the FLSA or FMWA.  In

reaching this conclusion and granting Nissan summary judgment on those claims,

the District Court did not improperly disregard any evidence.  Indeed, the evidence

Plaintiffs pointed to below and on appeal—primarily, the APRM and Dealer

Agreement's general contractual standards—simply does not carry the day for

them.  This Court should affirm.

This Court should also affirm the District Court's unjust enrichment and

class certification rulings, because Plaintiffs offer no challenge to either beyond

30

what they already argue on the joint employment front—that is, their incorrect assertions that Nissan is a joint employer and the District Court ignored evidence (that it in fact addressed). Once this Court rightly affirms that Nissan did not jointly employ Plaintiffs, nothing is left of those challenges. Opening Br. 30 (arguing that class certification "mirror[s] much of the joint employer factors" and arguing the district court "omitted key support" for Plaintiffs' arguments consisting of the APRM and Dealer Agreement); *id.* at 30 n.4 (arguing in a single footnote that summary judgment against the unjust enrichment claim was "unsupportable" for the same reasons). This Court can resolve them on that basis—and for the other reasons discussed below.

### D. The District Court correctly granted Nissan summary judgment on Plaintiffs' unjust enrichment claims.

Plaintiffs complain in a two-sentence footnote that the District Court's decision to grant summary judgment to Nissan on the unjust enrichment claims is "unsupportable." Opening Br. 30 n.4. This single footnote does not adequately raise or preserve this issue for appeal. *Tallahassee Mem. Reg'l Med. Ctr. v. Bowen*, 815 F.2d 1435, 1446 n.16 (11th Cir. 1987); *see King v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 248 F. App'x 123, 125 & n.1 (11th Cir. 2007) (mere mention of or passing references to issue insufficient to preserve it for appeal).

Plaintiffs are also incorrect about their waived argument. As the District Court observed, a Florida unjust enrichment claim requires proof that the plaintiff

directly conferred a benefit on the defendant. Dkt. 194, p. 9 n.1; *see Kopel v. Kopel*, 229 So.3d 812, 818 (Fla. 2017). There is no evidence that Plaintiffs conferred any direct benefit on Nissan, given that Nissan was not their employer and they worked exclusively for the dealerships. And Plaintiffs identify none. They assert that the District Court "failed to note the APRM and Dealership [A]greement," Opening Br. 30 n.4, but Plaintiffs do not explain how those documents governing the relationship *between Nissan and the independent dealerships* reveal any benefit that Plaintiffs directly conferred to Nissan. Instead, the evidence is clear that Plaintiffs worked for the independent dealerships and any benefits they conferred on anyone went directly to those dealers and not to Nissan. This Court should affirm.

## II.    The District Court correctly denied Plaintiffs' motions for class and collective action certification.

The District Court also correctly held that the facts establishing that Plaintiffs—and the proposed class and collective—all worked for different dealerships under different pay structures (and not for Nissan) defeated their motion to certify a collective action and class.

To maintain a collective action under the FLSA, Plaintiffs (named and opt-in) were required to "demonstrate that they [were] similarly situated." *Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1258 (11th Cir. 2008). And to certify a class under Federal Rule of Civil Procedure 23, there must be common "issues that

are susceptible to class-wide proof." *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001). The District Court properly exercised its discretion in concluding that the proposed collective and class here were neither similarly situated nor presented issues capable of class-wide proof. Dkt. 194, p. 9 n.2; *see Morgan*, 551 F.3d at 1260 (collective action certification reviewed for abuse of discretion); *Murray*, 244 F.3d at 810 (class certification rulings reviewed for abuse of discretion). And because the District Court did not clearly error in making the factual finding that Plaintiffs were not similarly situated, this Court must affirm. *See Morgan*, 551 F.3d at 1260 ("We will reverse the district court's fact-finding that Plaintiffs are similarly situated only if it is clearly erroneous—not simply because we might have made a different call.").

Plaintiffs' primary complaint about the District Court's decision appears to be that the District Court did not sufficiently analyze or provide reasoning on the certification issue. *See* Opening Br. 29-30. But it did. Not only did the court specifically address this issue in a long footnote with multiple citations, Dkt. 194, p. 9 n.2, but as Plaintiffs acknowledge, the "similarly situated" and commonality inquiries "mirror" the joint employment analysis, Opening Br. 30—on which the District Court expounded at length. So related are these inquiries that Plaintiffs' certification motion in the District Court focused almost entirely on arguing the joint employment factors. *See generally* Dkt. 169. The District Court's reasoned

analysis of the joint employment issue, then, combined with its added discussion of

certification, more than sufficed to explain why Plaintiffs were not similarly

situated and lacked commonality.

And that decision was correct.  Courts addressing the "similarly situated"

question must consider the "disparate factual and employment settings of the

individual plaintiffs."[3]  *Morgan*, 551 F.3d at 1261.  Plaintiffs need not "hold

identical positions" but must demonstrate adequate similarity in their "job duties

and pay provisions."[4]  *Id.* at 1261-62; *see also id.* at 1261 ("[A]s more legally

significant differences appear amongst the opt-ins, the less likely it is that the

group of employees is similarly situated.").  In other words, they need, at the very

---

[3] Courts in this circuit often take a two-step approach to certification of a collective action, assessing "conditional" certification based on a "lenient" notice-pleading standard, and then deciding whether to decertify any collective action once discovery is complete, at which point plaintiffs face a "stricter" standard and heavier burden to show they are similarly situated.  *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 952-53 (11th Cir. 2007).  District courts are not *required*, however, to follow this approach, and instead retain broad discretion in how they approach certification.  *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001); *see Morgan*, 551 F.3d at 1260 (This Court does not "require[e] a rigid process for determining similarity").  The District Court addressed certification at the final pretrial conference, after discovery closed and on a full record—meaning it effectively decided certification at the second, more demanding stage.

[4] There must also be adequate similarity in the potential defenses that apply to the claims; courts thus also consider "the various defenses available to defendants that appear to be individual to each plaintiff" as well as "fairness and procedural considerations."  *Morgan*, 551 F.3d at 1261.  Given the lack of similarity in Plaintiffs' job duties and pay provisions, the District Court did not need to reach these issues.

least, to be subject to the same employer's payment policies.  The same is true for commonality: there cannot be common issues of underpaid wages susceptible to classwide proof if each plaintiff was paid differently by a different employer.

As the joint employment analysis showed, Plaintiffs here neither had the same employer nor were subject to common pay provisions.  Plaintiffs' continual resort back to the APRM and Dealer Agreement—neither of which makes Nissan a joint employer or set out a common policy of how dealers paid technicians—do not change this conclusion or show any clear error in the District Court's factual determination.  Because Nissan is not their joint employer and its flat-rate payments to dealers had no impact on Plaintiffs, there is nothing to unite the Plaintiffs or their claims for unpaid wages.  The District Court thus correctly denied certification for lack of commonality and similarity.

## **CONCLUSION**

For these reasons, this Court should affirm.

Dated: October 5, 2023                     Respectfully submitted,

                                        */s/ Matthew A. Fitzgerald*
                                        Matthew A. Fitzgerald
                                        Virginia Bar No. 76725
                                        Kathryn M. Barber
                                        Virginia Bar No. 88992
                                        MCGUIREWOODS LLP
                                        Gateway Plaza
                                        800 East Canal Street
                                        Richmond, VA 23219
                                        T: (804) 775-4716

F: (804) 698-2251
mfitzgerald@mcguirewoods.com
kbarber@mcguirewoods.com

Peter N. Farley
Georgia Bar No. 255165
MCGUIREWOODS LLP
1075 Peachtree Street N.E.
35th Floor
Atlanta, GA 30309
T: (404) 443-5623
F: (404) 443-5680
pfarley@mcguirewoods.com

*Counsel for Defendant-Appellee*
*Nissan North America, Inc.*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 8,025 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman style.


Dated: October 5, 2023                */s/ Matthew A. Fitzgerald*
                                           Matthew A. Fitzgerald

                                           *Counsel for Defendant-Appellee*
                                         *Nissan North America, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2023, I electronically filed the foregoing Brief with the Clerk of the Court using the CM/ECF system, which will send a notification of electronic filing to all counsel of record who are registered CM/ECF users.

I further certify that on the same day, four paper copies of the foregoing Brief were sent to the Clerk of this Court via Federal Express next-day delivery pursuant to 11th Circuit Rule 31-3.

Dated: October 5, 2023

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald

*Counsel for Defendant-Appellee*
*Nissan North America, Inc.*